# CHARLESTON.

ATKINSON *v.* PLUMB *et al.*

Submitted February 8, 1897.—Decided December, 14, 1898.

1. EQUITY—*Evidence—False Evidence.*

   The evidence of parties who attempt to impose on a court of
   equity by false statements, manufactured accounts, or like decep-
   tive practices, should be rejected on the hearing of the cause. (p.
   633).

Appeal from Circuit Court, Wood County.

Bill by W. F. Atkinson against D. S. Plumb and others.
Decree for defendants, and plaintiff appeals.

*Reversed.*

JAMES A. HUTCHINSON and W. E. McDOUGLE, for appellant.

R. B. GRAHAM and CASTO & FLEMING, for appellees.

DENT, JUDGE :

The history of the case is as follows:   Some time in the
70's, D. S. Plumb, a mechanic,—a house painter and paper
hanger,—with little capital, but lots of pluck, as it after-
wards turned out, began business as a green grocer in a
little old frame building down on Ann street, in the city of
Parkersburg; his wife, Mary Jane Plumb, at about the
same time running a restaurant, both working together for
mutual benefit,—not an uncommon occurrence for hus-
band and wife; not a thing to arouse unwarranted suspicion
or to create alarm.   Being good Baptists, they made the

acquaintance of the plaintiff, W. F. Atkinson, who was also a good Baptist, and regular attendant at church. Brother Atkinson was a notary public, a real estate agent, and money lender, and at one time was engaged with witness Piersol in running a tow show boat along the Mississippi river and its tributaries,—Piersol running the boat, and Atkinson furnishing the means. This latter is cautiously revealed on cross-examination, and is a matter that should have its due weight in this controversy. Church acquaintance ripened into a very warm friendship between the two parties, and through the advice of Brother Atkinson, Brother Plumb purchased a small stock of goods and groceries of one Stagg, who wanted to retire from business, situated on the corner of Market and Third streets. Brother Atkinson moved his safe and desk into Brother Plumb's store, and the latter went into business on a much larger scale. To procure money or meet bills, notes were given to the bank, which, as Brother Plumb states, Brother Atkinson indorsed readily without the asking. The building in which the store was situated belonged to one Mum Jackson, but this probably had little effect on the transactions between the parties. Business was moving along prosperously, at least seemingly, when Brother Atkinson suggested to Brother and Sister Plumb that they should buy a home, and put it in the wife's name. A suitable property, with the aid of Brother Atkinson, was found and purchased for one thousand one hundred and thirty dollars on credit, and to pay the purchase money, after some intermediate transactions, finally a loan, was negotiated with the Traders' Building Association and a deed of trust executed on the property to secure the same, originally one thousand two hundred dollars, now about equaling the market value of the property, at least exclusive of the improvements afterwards put upon it. This is the property now in controversy. At length Brother Plumb's notes and bills began to mature rapidly, and he some times imbibed too freely and became prostrated. Brother Atkinson continued to sign notes for discount, until, becoming a little weak in the knees, and sister Plumb being in poor health, he induced her to make a will, giving her property to Brother Plumb, that in case of her death he could be se-

cured as indorser of notes. Creditors becoming importunate and threatening suit, Brother Atkinson's faith gave way entirely and, becoming aroused and alarmed, he figured up Brother Plumb's liabilities, and found them much larger than had entered into his dreams. He at once insisted on Brother Plumb confessing judgment to him for one thousand five hundred and sixteen dollars and eighteen cents, as of July 8, 1891, and fourteen dollars and ten cents. There being already a judgment in favor of Shattuck & Jackson, this latter straw broke the camel's back, and the store was taken possession of and closed by a constable. A sale followed, and, although the services of the best auctioneer that could be found were procured, a stock of goods valued by Brother Plumb at two thousand one hundred dollars was sold out at about five hundred dollars. Hats that he had paid twelve dollars a dozen for were sold for twenty-five cents apiece, and fur caps costing fifteen dollars to eighteen dollars per dozen, at thirty-seven cents apiece. In Brother Plumb's own language: "They were literally thrown away. They piled them up in heaps, and asked a man what he would give for them." So, after the expenses of sale and prior execution were satisfied, nothing remained for Brother Atkinson, although his claim for rent, for which he was liable, and the judgment, amounting to about two thousand dollars. Brother Atkinson asked Brother Plumb to get his wife to give him a deed of trust on her property to secure him, as she had always promised that he should not lose anything. Brother Plumb suggested the matter to sister Plumb, and she was thunderstruck, and did not know what to make of it. After she recovered sufficiently, she said she would not give a deed of trust on her property if it was to her own father. Brother Atkinson thus brought roundly to a standstill, was also thunderstruck, and rushed off to consult James Hutchinson, Esq., a learned attorney at law, since deceased, who, having listened to the tale of woe poured into his listening ears, advise an appeal to the courts, where justice is unerringly administered. A bill was filed, and the Plumbs summoned, and brotherly kindness no longer existed between the parties. The defendants employed another prominent and equally learned, attorney at law, to

aid them in frustrating the unconscionable schemes of At-
kinson, to deprive Mrs. Plumb of the little home she had
so long been in securing.    Thus ensued the battle of legal
giants.    Day after day it was waged with ceaseless vigor
and tireless energy.    Witness after witness was placed on
the witness stand, and examined, cross-examined, re-
examined, and re-cross-examined, etc., amid the objections,
and cross-objectious, criminations and re-criminations, and
masterly debates of the learned counsel, duly interpolated
in the depositions, and reported by the patient stenograph-
er, until a large volume, consisting of four hundred and
eighty pages, at a cost for transcrit of one hundred and
sixty-two dollars, and printing, three hundred and sixty-
five dollars and thirty-two cents,—about the size of Wat-
terson's History of the Spanish War,—is produced of the
story, complete in one volume, of the Plumb family in re-
lation to its dealings with W. F. Atkinson, for the consid-
eration, information, and assistance of the court in de-
termining which of the parties is the true aggressor
against the other, that equal justice may be meted out
without fear, favor, or affection.    Mrs. Plumb, in her dep-
osition, is made to detail her history, beginning way back
in the '50's, when she was an unwedded maiden, in the
sweet 'teens, teaching her first school, in the state of New
York, earning forty dollars per month for four months in
the year.    At this time she first met Plumb, who was in
the blush of early manhood, engaged in business as clerk
in a grocery store.    They were mutually attracted towards
each other,—a thing not of rare occurence.    An attachment
followed, which in 1857, was consummated by marriage.
She then immediately began to keep an account against
him, and loan him money, to be some time afterwards re-
paid to her in a home.    She kept this up all throughout
her married life, and throughout their various changes of
location and fortune.    The money so loaned was her early
school money, and sums she had received from her fath-
er and sister, and earnings on her farm.    Although
her source of income was inconsiderable, according to
Plumb's statement, her pocket book, like the widow's
cruse of oil, was never empty.    She always had money
ready to loan him, and he was always a willing borrower.

Some time after marriage they moved to Indianapolis, then to Chicago, and just before the great fire they moved to Wood County, and resided with her brother, John S. Meade. In 1874 she bought a farm for one thousand dollars, paid the first payment on it, and in about five years surrendered it for the unpaid purchase money. She continued to rent it until they moved to Parkersburg, when her husband says she saved over one thousand dollars clear out of corn, wheat, butter, eggs, chickens, and cattle, which she loaned to him at various times. She could have paid for the farm, but concluded to give it up, and moved to Parkersburg, where she had succeed in starting him in business. She exhibited a little book containing this account, with which she continually refreshed her memory, and which she says she began to keep 'way back in 1857. When, however, she was cross-examined about this book rather severely by Mr. Hutchinson, she became quite sick, and her statements became rather wild and wandering. Her counsel insisted that she was too ill to go on with the examination, and that he had a certificate of a physician to that effect that he had not intended to show, and of which opposing counsel was aware. After some further altercation between counsel, the taking of her evidence was adjourned until another day. The witness was finally compelled to admit that the first statements about the book and the account contained therein were untrue, caused by her failure of memory, loss of sight, and ill health. It clearly appears that this account in this book was fixed up by the defendants after the institution of this suit. A part of the early account is as follows, beginning a few days after marriage.

Olean, N. York, Oct. 8, 1857.

M. J. PLUMB,

*In acct. with* D. S. PLUMB.

D. S. PLUMB, Dr.

1857.

| | | | | |
|---|---|---|---|---|
| Oct, | 8, | To cash | $ | 75 00 |
| " | 18 | " " | | 22 00 |
| Nov. | 1. | " " | | 50 00 |
| Dec. | 12. | " " | | 5 00 |
| " | 20. | " " | | 10 00 |

| Dec. 27. | To cash | | .............................................................. | 10 | 00 |
| 1858. | | | | | |
| Jan 12. | " | " | .............................................................. | 19 | 00 |
| 1859. | | | | | |
| Aug. 18 | " | " | .............................................................. | 95 | 00 |
| Jan. 2. | " | " | .............................................................. | 150 | 00 |
| 1863. | | | | | |
| Aug. 6. | " | " | .............................................................. | 125 | 00 |
| 1864, | | | | | |
| Feb. 4. | " | " | .............................................................. | 44 | 00 |
| June 10. | " | " | .............................................................. | 35 | 00 |
| 1865. | | | | | |
| July 13. | " | " | .............................................................. | 100 | 00 |
| 1866. | | | | | |
| Apr. | " | " | .............................................................. | 2 | 00 |
| " 5. | " | " | .............................................................. | 5 | 00 |
| Oct. 29. | " | " | .............................................................. | 100 | 00 |
| 1867. | | | | | |
| Mar. 9. | " | " | .............................................................. | 28 | 40 |
| June 3. | " | " | .............................................................. | 75 | 00 |
| 1868. | | | | | |
| Jan. 6 | " | " | .............................................................. | 35 | 00 |
| Apr. 8. | " | " | .............................................................. | 25 | 00 |

$1,010 40

### D. S. PLUMB, CR.

| 1857. | | | | | |
| Dec. 14. | By cash | | .................................................$ | 9 | 00 |
| 1859. | | | | | |
| Sept. 9. | " | " | .............................................................. | 55 | 00 |
| 1863. | | | | | |
| Aug. | " | " | .............................................................. | 100 | 00 |
| 1864 | | | | | |
| Sept. 5. | " | " | .............................................................. | 22 | 50 |
| 1865. | | | | | |
| Sept. 6. | " | " | .............................................................. | 35 | 00 |
| 1867. | | | | | |
| Aug 16. | " | " | .............................................................. | 37 | 00 |
| 1866. | | | | | |
| Dec. 10. | " | " | .............................................................. | 85 | 00 |
| 1868. | | | | | |
| June 13. | " | " | .............................................................. | 20 | 00 |

$ 363 50

- Etc.

The sources from which she received most of her money are detailed as follows:

| Received for teaching school | ...................................................$ | 120 | 00 |
| 1856. | .................................................... | 120 | 00 |
| 1856. | | | |
| Jan. From Brother Dorm | .................................................... | 75 | 00 |

| | | | | |
|---|---|---|---|---|
| 1859. | | | | |
| Sept | From father | | | 100 00 |
| Oct. | " | " | | 20 00 |
| 1860. | | | | |
| Apr. | " | " | | 20 00 |
| 1861. | | | | |
| June. | " | " | | 25 00 |
| 1862. | | | | |
| Sept. | " | " | | 50 00 |
| 1863. | | | | |
| July. | " | " | | 5 00 |
| 1864. | | | | |
| Oct. | " | " | | 10 00 |
| 1865. | | | | |
| Jan. | " | " | | 20 00 |
| 1868. | | | | |
| Dec. 19. | Sister Maude | | | 350 00 |
| | | | | $ 915 00 |

The account is exhibited as carefully and accurately kept beginning back in 1857, and ending with the bringing of this suit, and being balanced, shows Plumb, after all his payments on the property, repairs, etc., in debt to Mrs. Plumb, one thousand six hundred and one dollars and seventy-nine cents,—a little in excess of plaintiff's judgment. This whole account, except that she may have received the money, was undoubtedly manufactured for the purpose of this suit by collusion between the defendants, and entirely discredits their testimony. There are many other things detailed by these defendants as to their money dealings with one another, especially the accuracy with which every dollar of account between them was carefully kept and accounted for, so different from the ordinary relations existing between husband and wife, when the wife imposes such implicit trust and confidence in her husband, as represented by them, that render their statements improbable, and deprive them of any weight in the determination of this cause. Casting their evidence aside, the other facts and circumstances show that whatever interest they, or either of them, have in the property in controversy, or in the improvements put thereon, came from the husband's business. Atkinson was fully aware of what was going on all the time, and connived at it, but, as a brother in the church, he had no idea that those who were in such close communion with him would deceive or

attempt to defraud one of the chosen band of Gideon.
They might despoil the gentiles, but not the elect; and
they undoubtedly humored him to this belief, for Sister
Plumb was very careful to assure him that he should not
suffer, when he was about to start to New Orleans to see
about his show boat.    But, while it was the hand of Esau,
it was the voice of Jacob, and the mess of pottage did the
rest.  His confidence was abused under the guise of friend-
ship, which blinded his eyes, and he was despoiled by those
of his own household; and with the earnest plea for retri-
bution he seeks justice against his despoilers.    What we
have we freely give unto him.

This case is governed in all respects by the principles
settled by this Court in *Miller* v. *Cox*, 38 W. Va. 748, (18 S.
E. 960); *Brooks* v. *Applegate*, 37 W. Va. 373, (16 S. E. 585),
and other cases to which reference is made herein.    All
appellant can subject to his debt, however, is the equity of
redemption in the property in controversy.    The building
association has a prior lien, which, at the commencement
of this case, amounted to one thousand forty dollars and
seventy-six cents, and the defendants had at that time
ceased to pay anything thereon, so at the present time the
debt must amount to about the full value of the property.
The appellant's costs, except expenses of sale, must yield
in priority to the association lien, and therefore he may
have had his troubles for his pains, and this litigation
prove abortive, except the satisfaction of personal triumph
over a faithless religious brother, who, under the cloak of
piety, won his love, only to shake his confidence in all pro-
fessions of friendship.    The suit appears to be a contest
over a bag of wind, and this Court might affirm the decree
without, probably, inflicting pecuniary loss or gain to any
one; yet as a court of equity it should not hesitate to
rebuke those who attempt to impose upon it by false state-
ments, manufactured accounts, or other deceptive practi-
ces, for the purpose of deterring future attempts of like
nature.    For these reasons, the decree complained of is
reversed, and the cause remanded for further proceedings,
according to the rules and principles governing courts of
equity.

*Reversed,*