# CHARLESTON.

## ATKINSON v. PLUM.

Submitted June 6, 1901.   Decided November 16, 1901.

1.  TRUST DEED—*Lienor's Preference.*
    Where one releases a deed of trust and takes a new deed of trust for a balance of his debt, a lienor subsequent to the first deed of trust thus gets preference over the second deed of trust, and equity will not cancel the release against such second lienor, except for fraud or mistake.   (p. 108).

2.  ESTOPPEL—*Representations—Material Facts.*
    To create an estoppel by conduct there must be some conduct of the party amounting to a representation or concealment of material facts.   (p. 109).

3.  ESTOPPEL—*Fraud—Intent—Negligence.*
    To create an estoppel by conduct the representation must be made with the intention, actual or fairly to be inferred by the other party, that such other party should act upon it, or such representation should be so grossly negligent as to mislead another to his injury, and thus amount to fraud constructively.   (p. 110).

4.  ESTOPPEL—*Error—Fraud—Equity.*
    The doctrine of estoppel by conduct always presupposes error on one side and fault or fraud upon the other, and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage.   (p. 110).

5.  ESTOPPEL—*Information—Conduct.*
    It is essential to an estoppel by conduct that the party claiming to have been influenced by the conduct of another should

not only be destitute of information as to the matter to which such conduct relates, but also without convenient and available means of acquiring such information. (p. 112).

6. EQUITY JURISDICTION—*Writing—Mistake.*

To authorize equity to cancel a writing on the ground of mistake based on mistaken belief of a party, that belief must be a fair and reasonable one justified by facts adequate to inspire it. (p. 112).

Appeal and *supersedeas* from Circuit Court, Wood County.

Bill by W. F. Atkinson against D. S. Plum and others. Decree for defendants. Plaintiff appeals.

*Affirmed.*

W. N. MILLER and F. P. MOATS, for appellants.

DAVID D. JOHNSON and W. E. McDOUGAL, for appellees.

BRANNON, PRESIDENT:

Mary Jane Plum being the owner of real estate in Parkersburg she and her husband, D. S. Plum, made a deed of trust to secure the Traders Building Association in the sum of twelve hundred dollars on said property. D. S. Plum confessed a judgment in favor of W. F. Atkinson, and Atkinson brought a suit in the circuit court of Wood County claiming that this property had been purchased with the means of the husband, D. S. Plum, though conveyed to his wife, and that it was liable for the debt of Atkinson. The circuit court decided that it was not liable for Atkinson's debt and dismissed the bill. From this decree Atkinson took an appeal to this Court, and as will be seen in 45 W. Va. 626, this Court held that the property was liable for Atkinson's debt, and reversed the circuit court, holding that the building association held the first lien, and Atkinson the next. Some time after the decree in the circuit court, and before Atkinson took his appeal, there was paid on the building association debt money sufficient to reduce it to the sum of five hundred dollars, and the said Plum and wife purchased an advance of five hundred dollars from said building association and executed a deed of trust upon said property to secure the same, and the said building association surrendered the bond for the loan of said twelve hundred dollars, and executed a formal release of the deed of trust made to secure said loan of twelve hundred dollars. Afterwards this Court rendered the decision in favor of Atkin-

son above stated, and then Atkinson filed what is called an amended bill in the case setting up the reversal o fthe former decree of the circuit court, and setting up that the first deed of trust in favor of the building association had been fully paid and discharged, and that said association had executed a release of said first deed of trust and surrendered its evidence of that debt, and claiming that the lien of that deed of trust had ceased and that the debt of said Atkinson had become the first lien upon said property. The building association filed an answer to this amended bill, which is really a supplemental bill, though its name is immaterial, in which answer it contended that the lien of its first deed of trust should be restored to it so as to give the building association priority over Atkinson for the amount due to the association under the second deed of trust and prayed that the release be cancelled. This answer says that the old debt had not been in fact paid off, but had only been reduced by partial payments to the amount secured by the second deed of trust, and that the second deed of trust represents in truth only a balance of the old debt. It further set forth that Atkinson had represented to Plum and his wife that he did not propose to appeal from said decree of the circuit court, and that this fact had been reported to the association by said Plums, and that considering this and the fact that Atkinson had not yet, after the lapse of some sixteen months, taken appeal from said decree, the building association consented to the said new loan and took the second deed of trust and executed a release of the first, and that such release was executed in the belief and faith that Atkinson would not controvert the said circuit court decree or further seek to assert his debt by an appeal. The case was referred to a commissioner to report the liens on the property, and he reported Atkinson's debt as the first lien and the building association's second deed of trust as a second lien, thus denying to the association the benefit of its first deed of trust. The decree of the circuit court also gave Atkinson priority of lien and denied the prayer of the answer of the association that the release be cancelled and the lien of the first deed of trust restored. From this decree the building association has appealed.

There are only two questions which I deem material to be considered in this case. The first one is a nice and troublesome one and that is whether, as a matter of law, the new deed of trust and the release of the old one extinguished the lien of the

first deed of trust and thus gave priority of lien to Atkinson's debt. It is contended for the association that its old debt has never in fact been paid, or if so regarded that it would get the benefit of the first deed of trust on principles of subrogation. I do not see that the law of subrogation enters into the case. That is applied where a new party comes in and pays off a prior lien. It does not apply where the creditor himself pays off his own lien by furnishing money and taking a second security—where he takes a second mortgage for a balance of the old debt. It seems to me that the question is whether the surrender of the bond for the old debt and the taking of a new deed of trust for the balance, and the execution of a formal release of the old deed of trust, operate in law to waive the first deed of trust and discharge its lien. The case, in this point of view, falls under the principle of the waiver of liens and debts by change of the securities. It is unquestionable law that a mere change of securities of equal dignity for a debt is not a novation of that debt, is not payment or release thereof *per se*. A second deed of trust on the same property does not alone discharge the lien of the first. Therefore the mere execution of the second deed of trust to the building association on the same property for a balance of the same debt would not alone, without more, remove the first deed of trust given to the building association. It may be said with some force that whilst such is the law in ordinary cases, it would not be so in the case of building associations, because a loan by such an association is a formal proposition for a specific sum acted upon by its directors, and that a second loan, though intended to be applied in discharge of a first loan and deed of trust, is itself a distinct proposition of another loan, a different loan, approved as such by its authorities, and that it abrogates the first loan. Still, it seems to me that courts of equity would look at the substance, and would not hold the second loan, merely as such, though secured by a second deed of trust, to be a release of the first deed of trust, *per se,* unless there is something more to show the intention, as there generally is in case of loans by such associations. While the rule above stated that the mere execution of a second mortgage for the same debt, or the giving of a new note, will not alone discharge the first mortgage or be considered a payment of it, still if such be the intention of the parties, it would be such release or payment. These principles will be found fully stated in *Fidelity Co.* v. *S. V. R. R. Co.,* 86 Va. 1; *Coles* v. *Withers,* 33 Grat. 186;

*Farmers Bank* v. *Mutual Assurance Society,* 4 Leigh 69;
*Hopkins* v. *Detweiler,* 25 W. Va. 734; *Bank* v. *Good,* 21 W.
Va. 465; *Hess* v. *Dille,* 23 *Id.* 90; 1 Jones on Mortgages, ss. 924,
926. But it will appear from those authorities that where the
intention of the parties is that the change of security or evidence
of debt is to operate as a discharge of the first mortgage or note,
it will so operate. Intention is the pole star in the matter. It
is a matter of contract. In this case not only was there a formal
application for a distinct loan, and an approval of it by the as-
sociation and a deed of trust taken for this new loan, or call it
renewal if you will, but there was a formal release of the first
deed of trust and a surrender of the bond given for it. We do
not have to gather the intention of the parties from the circum-
stances, because this recorded release tells unquestionably the
intention to abrogate the first bond and deed of trust. Did it not
so operate between the association and Mrs. Plum? Why will
it not so operate as to Atkinson? The reason would be stronger
for such operation as to him. I do not fail to realize the argu-
ment that in fact the debt was never paid, and that Atkinson is
not a creditor whose rights had birth after that release, and that
he is not injured by the transacation, but viewed as a second
lienor is benefited by the reduction of the debt, and that the asso-
ciation may say to him with force, "Your right is younger than
ours. You did not invest your money on the faith of that re-
lease; you are not injured, your condition is not made worse, but
better by the reduction of our claim, and therefore we do no in-
justice to you by claiming priority under the first deed of trust."
I realize that there is great force in this position, and the case
has been one of perplexity to this Court; but there stand the new
loan, the new deed of trust, the new bond and the release. They
have some legal effect. Atkinson was a creditor next to the
first deed of trust, and we think that he can avail himself of the
benefit of that release. I find the following in section 971, Vol.
1, Jones on Mortgages: "When a new mortgage is substituted in
ignorance of an intervening lien, the mortgage released through
mistake may be restored in equity and given its original priority
as a lien." *Kern* v. *Hotalling,* 50 Am. St. R. 710; *Young* v.
*Shaver,* 5 *Id.* 701. Tried by this law the association cannot suc-
ceed, because it was not ignorant of Atkinson's lien, but had dis-
tinct knowledge of it, the association being a formal party to the
chancery suit, and acted with its eyes open to Atkinson's right.

The second question in the case is whether Atkinson is estopped from claiming priority over the association by his conduct—whether an estoppel *in pais* arised against him therefrom. Let us see what he did. Mr. Butcher, the secretary of the association, says that after the decree, "As I remember the matter, Mr. Atkinson gave me to understand that by-gones were to be by-gones between him and Plum, and he had extended to Mr. Plum the right hand of fellowship." When asked whether Atkinson told him that he did not intend to take an appeal, he replied "I don't intend to say that that is his exact language." Thus he does not state that Atkinson told him that he would not take an appeal. He further says that Atkinson's talk was "church talk—that is he spoke of the connection of Plum and his wife with the Baptist congregation, and that by reason of this litigation they had withdrawn from the church, and that it grieved him to know that such a condition of affairs was there, and that acting upon that prompting, he invited them back, and as I have always understood the Baptist church extended to them the right hand of fellowship." He further says: "This five hundred dollar loan would never have been brought to the attention of the board if there had been any impression left by Mr. Atkinson on my mind that he intended to appeal this suit." Mr. Plum states that Atkinson shook hands with him and told him the costs were all paid and said, "Let it go; it was paid for." Mrs. Plum states that Atkinson said to her that he had seen Plum and had told him that the suit had gone against him and he had paid the costs, and that he wanted them to come to church. Atkinson was the minister of the church. Now, this is all that is shown on the side of the association to raise an estoppel against Atkinson. It simply shows that Atkinson regretted the trouble in the church over the suit, and that he wanted that healed. It does not constitute an explicit promise or pledge to the association that he would yield up his debt or forego his right of appeal, should he come to the conclusion that he could successfully appeal. The evidence reveals the fact that this conversation of Atkinson was casual, and only bespoke his anxiety to have personal and religious association and good feeling with Plum and his wife, and not meant by Atkinson to be a matter of business conversation. This subject of estoppel *in pais* is one of great importance, and one of difficulty, and one that has received much discussion in the courts. How far ought

a party's conversations or statements deprive him of his rights of property on the theory of estoppel is a very difficult question. Surely not every casual statement that a man happens to make in social intercourse, or even in a business matter, where it is sought to be set up against him as an estoppel, will so operate. Each case largely stands on its own facts. General rules have been stated. In *Bates* v. *Swiger,* 40 W. Va. 420, we said that "Where one, by words or conduct, intentionally causes another to believe in the existence of a certain state of things, or such words or conduct are of such nature as he has reason to believe will cause him to so believe, and such other, not knowing to the contrary, acts thereon, the former will be estopped from averring or claiming under a different state of things, then existing and known to him, to the prejudice of the other party." In *N. & W. R. Co.* v. *Perdue,* 40 W. Va. 442, we said that the statement must be made "either designedly or with willful disregard for the interests of others." The word "intentionally" used in *Bates* v. *Swiger, supra,* is not too strong. It is not meant thereby that there must be an intention to deceive; but "the representation must have been made with the intention either actual or rasonably to be inferred by the person to whom it was made, that it should be acted upon. In general, where there is nothing reasonably indicating that the representation was intended to be acted upon as a statement of the truth, or that it was tantamount to a promise or agreement that the declaration is true so as to amount to an undertaking to respond in case of its falsity, the party making it is not estopped from proving the truth." Bigelow on Estop. 628. The word "wilfully" is frequently used in defining estoppel. The United States Supreme Court has said in *Brant* v. *Virginia Coal & Iron Co.,* 93 U. S. 326, that "For the application of the doctrine of equitable estoppel there must generally be some intended deception in the conduct or declarations of the parties to be estopped, or such gross negligence on his part as amounts to a constructive fraud, by which another has been misled to his injury."

See also 11 Am. & Eng. Ency. L. (2 Ed.) 431. Now these declarations of Atkinson, or rather conversations, were not made to induce the association to make a release, as we have no evidence that he knew of such a transaction, nor could we call them negligence when it is not shown that he knew of any proposed release. When the secretary of the association said that Atkin-

son gave him to understand that he would not appeal, he explicitly says that that was simply his impression collected from what Atkinson said, his mere inference, because he says that Atkinson did not say so in words. Of course the declarations of Atkinson that he wished Plum and his wife to return to church and let by-gones be by-gones were not meant to be taken as an inducement to the building association to act upon them by a new loan and the release of the deed of trust, nor were they meant to be taken in any such sense, and it would be stretching them far to give them the force of taking from Atkinson his legal rights.

Another important element in this case is, that in order to make a statement operate as an estoppel there must be some misconduct of the party amounting to a representation or concealment of material facts. *Eslis* v. *Jackson,* 111 N. C. 145, 32 Am. St. R. 784; 11 Am. & Eng. Ency. L. (2 Ed.) 424. What Atkinson said did not amount to an engagement not to take an appeal, nor a representation that he would not. He had no such intention of so engaging or representing, or deceiving the association, and could not have contemplated that it would act upon the faith of his words in making a release, as he knew nothing of any intention to make a new loan and a release. To bind a man by estoppel should it not appear that he knew that a given transaction was about to take place so as to enable us to say that he intended to further it by his statement, or at least enable us to say that he was grossly negligent in using language which might induce such action by the association? The Supreme Court of the United States has held in *Morgan* v. *Railroad Co.,* 96 U. S. 716, that "The doctrine of estoppel *in pais* always presupposes error on one side and fault or fraud upon the other, and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage." The same doctrine is held in *Sweney* v. *Pratt,* 70 Conn. 274, 66 Am. St. R. 101. If even Atkinson had made the explicit statement that he did not intend to appeal, it would not bind him, based on no consideration; surely not unless he knew that a release of the old deed of trust was in contemplation, even if it would then. And with what show of force can the association ask a court to relieve it from its carelessness? Was it not extreme carelessness to take such conversation of Atkinson as a basis for the solemn act of the release of its mortgage? Why did not the association

learn explicitly from Atkinson whether he intended to forego his appeal, and tell him why it propounded the question? In the above cited case of *Brant* v. *Virginia Coal & Iron Co.,* 93 U. S. 326, it is held that to enable a party to plead such an estoppel it is essential that he was not only destitute of knowledge of the true state of things, "but also of any convenient or available means of acquiring such knowledge." See also 11 Am. & Eng. Ency. L. (2 Ed.) 434, laying down the same doctrine. · So we cannot sustain the appellant's cause on the theory of an estoppel.

Can we cancel the release on the theory of mistake? I have stated above that where mortgages have been releasd in ignorance of the existence of subsequent incumbrances, the prior lien will be restored. Those cases go very far and their doctrine is questionable. Certainly they are questionable as to mortgages made subsequent to the release on the faith of that release. Can we say in this case that though the conduct of Atkinson does not constitute an estoppel, still the association acted under mistake in the belief that Atkinson would not take an appeal, but let the decree of the circuit court against him stand? Can we say that it falls under the principle of those cases holding that where a release is executed in ignorance of intervening liens, equity will cancel the release on the ground of mistake? There was no basis for an opinion or reliance on the part of the association that Atkinson would give up his debt and not appeal. A mistake to be relievable in equity must have a justifiable basis. The fact that Atkinson had paid the costs decreed against him in the circuit court could not fairly induce an opinion that he would not appeal, because he was compelled to pay them. Nor would the fact that he had delayed to appeal for sixteen months, because the law gave him two years in which to appeal. Nor could such an opinion be based safely on the mere declarations of Atkinson's above stated. We, therefore, cannot say that the association acted in the well grounded belief that there would be no appeal, since it had no solid ground on which to found such belief, so as to ask equity to relieve it on the ground of mistake. The truth is that it is simply asking a court of equity to relieve it from its own carelessness by resurrecting a mortgage destroyed by its own act of negligence. We cannot do this and therefore we affirm the decree, even though the case seems hard upon the association.

*Affirmed.*