# CHARLESTON.

MYLIUS *v.* KOONTZ, *et al.*

Submitted March 4, 1910.    Decided October 31, 1911.

ESTOPPEL BY CONDUCT.

> The principles of estoppel enunciated in *Railroad Co.* v. *Perdue*, 40 W. Va. 442; *Bates* v. *Swiger, Id.* 420; *Stone* v. *Tyree*, 30 W. Va. 687; *Williamson* v. *Jones*, 39 W. Va. 231; *Id.* 43 W. Va. 562, 4 Am. & Eng. Cases in Eq. 258, 371, and note; *Atkinson* v. *Plum,* 50 W. Va. 104; *Hanly* v. *Watterson*, 39 W. Va. 214, and Pomeroy Eq. Jur., sec. 807, applied to the facts in this case. (pp. 621 to 626).

Appeal from Circuit Court, Randolph County.

Bill of Charles E. Mylius against Jacob Koontz and others. Decree for plaintiff and defendants appeal.

*Reversed, and Bill Dismissed.*

*C. H. Scott, H. G. Kump, S. L. Spears,* and *Mollohan, McClintic & Mathews,* for appellants.

*W. B. Maxwell,* for appellee.

MILLER, JUDGE:

The injunction, which the court below, by its final decree, of August 5, 1909, refused to dissolve, in accordance with the prayer of the bill, enjoined defendants, Jacob Koontz, E. F. Phillips and John Stamm, their servants, agents and employees, from severing and removing any timber whatever from either lots number 14, 15 and 21, and especially from number 14 and 15, of the sub-division of the Phillips and Law survey, of nineteen thousand acres, as platted by David Goff, commissioner of forfeited and delinquent lands for Randolph county, in 1840.

The plaintiff's claim of title to these lands, particularly to lots 14 and 15, is the same as that relied on by him in *Mylius* v. *Raine-Andrew Lumber Company,* an action for damages for cutting timber, in which the judgment below in his favor was reversed by this Court, and the case remanded for a new trial. 69 W. Va. 376, 71 S. E. 404.

The defendants, Koontz, Phillips and Stamm, claim title to

411.8 acres, part of the land in controversy, by deed from their co-defendant, Thomas J. Arnold, and Eugenia H., his wife, dated November 12, 1906. Their title to the four other tracts involved they derived as follows: a half undivided interest therein, by deed from said Thomas J. Arnold and wife, and Elizabeth E. Arnold, executrix, etc., dated November 14, 1906; the other undivided half interest therein, they obtained from Charles R. Durbin and wife, by deed dated November 27, 1906. The object of the bill is not to try the legal title to these lands, but to maintain a *status quo,* until the legal title can be adjudicated in a suit in ejectment which the bill alleges plaintiff has brought and has pending against defendants.

As we view the case presented by the pleadings and proofs, it is wholly unnecessary to enter upon any consideration of the conflicting legal titles to these lands. The decree appealed from, though modifying the injunction in certain particulars, not necessary to notice, in effect, overrules the motion of defendants to dissolve the injunction as modified. This, then, is simply an appeal from an order refusing to dissolve the injunction. The decree in terms specifically provides that: "Nothing in this order shall be construed as settling the rights of the parties as to matters in controversy relative to lots No. 14, No. 15 or No. 21, but all rights of the parties relative to said lots are reserved for the future order of the court."

The real and only question presented for decision, therefore, is not whether the plaintiff, as against Thomas J. Arnold, has the better legal title to the lands in controversy, but whether, as defendants allege in their answers, he is estopped by his contract, or his conduct, or by both, from denying their title to these lands, and from intervening by injunction to stop them from cutting the timber thereon.

The facts pleaded by respondents are not denied, but admitted by plaintiffs; that in the spring of 1907, some months after Koontz, Phillips and Stamm had obtained their deeds for these lands, and had begun building their mills and houses, preparatory to cutting the timber, Mylius notified them of his claim, and not to cut or remove the timber. This interference of Mylius was at once brought to the attention of Arnold, who a day or two afterwards met Mylius in the law office of Arnold's

son at Elkins, Stamm being present, where Mylius and Arnold, as they both admit, verbally agreed on a settlement of their differences, as Arnold claims, on the terms of a prior agreement in writing between them, made in 1904. Stamm, though present, or nearby, claims not to have heard the full terms of this agreement; but he says, as both Mylius and Arnold admit, that they then notified him that they had settled, and that he and his co-partners were free to go ahead with their operations. Arnold's testimony in reference to this agreement in substance is, that Mylius and he had a previous written agreement about this 411.8 acres, and that he supposed it was settled; that when Mylius made objection to the operations of Koontz, Phillips and Stamm they came to him about it, and that he and Mylius talked the matter over again and had a further understanding, satisfactory to him, namely, using his language, that "in event any of this land was determined to be his, I was to pay Mr. Mylius the price per acre for that that was uncut, and for that part of the land that Mr. Mylius had cut over, I was to give him other land of equal value in place of it. That was about the agreement between us, and that's what they came to see me about. The agreement was satisfactory between Mr. Mylius and myself."

The agreement in writing of 1904, referred to by the witness and exhibited with his evidence provides, in substance, that if in the suits of Arnold against the Raine-Andrew Lumber Co., and Mylius against the same company it should be found that the northern line of lot No. 14, of the Phillips and Law survey, is the same as what is known as the Kupfer line; or wherever the northern line of said lot No. 14, and the northeastern corner of lot No. 15, should be located in said suits, then, in consideration of one dollar, in hand paid, and the covenants thereinafter set forth, Mylius agreed to release to Arnold all his claims to the land north of the Kupfer line, and east of three beeches, or east of wherever said corner of lot No. 15, might be located, and north of a line extending from where said corner might be located by said suits, south 76° east, with variation south 73° east; also to the owners of lot No. 21 of said survey, his claim, as owner of said lot No. 15, to all that portion thereof north of a line run north 76°, with variation 73° west, from said three

beeches, or wherever said northeastern corner of said lot might be located by said suits, to the intersection of a line run from two hemlocks and a service, north 14° east, with variation north 17° east. And in consideration of the premises, and the sum of one dollar by Mylius to Arnold in hand paid, Arnold thereby agreed to release to Mylius all his right, title and interest acquired by deed from Yocum, commissioner, to 348 acres, a portion of lot No. 22 of said survey, south of a said line run from the northeastern corner of said lot No. 15 (three beeches as claimed by said Raine), or from wherever said corner might be established by said suits, S. 76° east, with variation south 73° east; and also to release to Mylius his interest in lot No. 21, the Hare lot, south of a line run from said three beeches, or from wherever said northeastern corner of lot No. 15 should be located and established by said suits, north 76° west, with variation north 73° west, to the intersection of a line run from said southwest corner of lot No. 15, north 14° east, with variation north 17° east. By the last paragraph thereof it is said that this agreement is to obviate any further difficulties which may arise between the parties, as to where the line between said lots may be, and to thus locate and determine them, as they may be located in said suits.

That this written agreement is in full force and binding on the parties is not seriously controverted. It is charged by Arnold in a general way, that Mylius has violated the terms of the agreement, but we do not understand Arnold to claim that the agreement is thereby abrogated or nullified.

As we interpret the evidence of Arnold, relating to the verbal agreement, we understand him to say, not, as might be inferred from his language perhaps, that this agreement was on the same terms as the written one, but that the terms of the written agreement were again talked over and were satisfactory to both parties, and that because of the controversy with Koontz, Phillips and Stamm, the written agreement was supplemented by the verbal agreement, providing, how, as already recited, the parties should account to each other for the land in the events contemplated by the written contract.

Both Arnold and Mylius agree, moreover, that in concluding this verbal agreement they notified Stamm, for Koontz, Phillips

and Stamm, that they had settled their differences, and that they, Koontz, Phillips and Stamm were free to go on with their contract, and cut the timber, unaffected by the claims of Mylius. Mylius concedes, also, as testified by Stamm, that he confirmed the agreement afterwards in subsequent conversations, and that it was not until about the time of the bringing of this suit and obtaining the injunction in March, 1909, nearly two years intervening, and after said firm had completed the building of its mills and houses, and made contracts for lumber to be cut, rendering them liable for damages, and had paid all, or nearly all, the purchase money for the land, that Mylius set up a contrary claim.

These facts are pleaded and proven by appellants, Koontz, Phillips and Stamm, in estoppel of Mylius' right to maintain and prosecute the present suit against them. 'The question before us then, is, do these facts constitute a good defense? We are of opinion that they do, and that as to said firm, the injunction should have been wholly dissolved, and the bill dismissed. We reach this conclusion readily on the legal principles enunciated and elaborated by this Court in *Norfolk & Western R. Co.* v. *Perdue,* 40 W. Va. 442; *Bates* v. *Swiger, Id.* 420; *Stone* v. *Tyree,* 30 W. Va. 687; *Williamson* v. *Jones,* 39 W. Va. 231; *Id.* 43 W. Va. 562, 4 Am. & Eng. Dec. in Eq. 258, 371 and note; *Atkinson* v. *Plum,* 50 W. Va. 104; *Hanly* v. *Watterson,* 39 W. Va. 214; Pomeroy Eq. Jur. section 807.

It is objected by Mylius to this defense, that Stamm was present and knew that the contract, then verbal, was to be reduced to writing on the back of the agreement of 1904, and that being a contract relating to land, he was charged with knowledge of the law, that it was not enforceable, and not binding on the parties until reduced to writing.

The answer to this contention is that Koontz, Phillips and Stamm are not seeking in this suit enforcement of the contract between Arnold and Mylius, and no one, not even Arnold, has pleaded the statute of frauds. The statute of frauds, to be available, must be pleaded. *Cunningham* v. *Cunningham,* 46 W. Va. 1, 32 S. E. 998; *Howell* v. *Harvey,* 65 W. Va. 310, 64 S. E. 249; 20 Cyc. 311-312, and notes.

It is conceded on all hands that Arnold and Mylius made an

agreement, and notified Stamm for, his firm that they had settled their differences, and to go on with their timber operations. This agreement was re-affirmed afterward by Mylius, who stood by for nearly two years, knowing that that firm was relying on those representations, and were continually changing their condition for the worse before, by this suit, he again set up, against them, his claim of title to these lands. The authorities already cited, and many others in Virginia and in this state concur in holding the general proposition, applicable here, that "Where one, by words or conduct, intentionally causes another to believe in the existence of a certain state of things, or such words or conduct are of such nature as he has reason to believe will cause him to so believe, and such other, not knowing the contrary, acts thereon, the former will be estopped from averring or claiming under a different state of things, then existing and known to him, to the prejudice of the other party." See 5 Ency. Dig. Va. & W. Va. Reports, 230, et seq. Equitable estoppel under such circumstances will operate to vest or divest the title to real estate, in spite of the statute of frauds. See note to *Williamson* v. *Jones,* 4 Am. & Eng. Dec. in Eq. 258, 371.

Our opinion is that as to Koontz, Phillips and Stamm, the decree below should be reversed, the injunction wholly dissolved and the bill dismissed, and it will be so ordered.

*Reversed and Dismissed.*