# CHARLESTON.

## CARROLL-CROSS COAL COMPANY v. ABRAMS CREEK COAL AND COKE COMPANY.

### Submitted January 14, 1919.    Decided January 21, 1919.

1. CORPORATIONS—*Authority of General Manager—Scope.*

   The implied authority of a general manager of a corporation extends only to such matters as come within the scope of its ordinary business.    (p. 212).

2. MINES AND MINERALS—*Mining Corporations—Authority of General Manager—Lease.*

   The general manager of a corporation operating coal mines on leased territory has no implied authority to give, sell, trade or release to another such corporation any part of the leasehold estate.    (p. 212).

3. APPEAL AND ERROR—*Finding of Fact—Review.*

   In the absence of a preponderance of evidence against the finding of a trial court on an issue as to whether such corporation conferred upon its general manager express authority so to dispose of a part of its leasehold, or ratified his unauthorized attempt to make 'such disposition thereof, the appellate court cannot disturb the finding.    (p. 213).

4. MINES AND MINERALS—*Unauthorized Lease by Agent—Estoppel—Recovery of Compensation—Enforcement of Penalties.*    ,

   An unauthorized and unratified agreement made by a general manager of such a corporation with another, under which the latter has mined coal within territory covered by a lease owned by the former, does not estop it from recovery of compensation for the coal so mined nor from enforcement of the statutory penalties inflicted for mining within a prohibited area along the boundary line between the leases under which the two compaines are respectively operating.    (p. 214).

5. PRINCIPAL AND AGENT—*Silence of Agent—Estoppel of Principal.*

   Silence and inaction of an agent as to a matter not within his authority do not estop his principal.    (p. 214).

6. ESTOPPEL—*Knowledge of Trespass—Action for Injury.*

   Knowledge of a trespass or wrong perpetrated by one fully cognizant of the right invaded and silence respecting it after notice do not estop the injured party from asserting his right of action for redress of the injury done.    (p. 214).

7. APPEAL AND ERROR—*Irregularity of Taking Deposition—Cross-Examination—Witnesses—Reversal.*

An irregularity in the taking of depositions fully developing the merits of the cause, at which all of the litigating parties appeared and examined and cross-examined the witnesses, constitutes no ground for reversal of the decree founded upon them. (p. 215).

Appeal from Circuit Court, Mineral County.

Suit for injunction by the Carroll-Cross Coal Company against the Abrams Creek Coal & Coke Company. From a decree dissolving an injunction and dismissing the suit, complainant appeals.

*Decree affirmed.*

*D. L. Sloan* and *Wm. MacDonald,* for appellant.
*Warder & Robinson,* for appellee.

POFFENBARGER, JUDGE:

The decree pronounced on a full hearing and brought up for review by this appeal, dissolved an injunction and dismissed bills the object of which was restraint ⸢by an injunction of two actions at law instituted against the plaintiff herein by the defendant; one for the recovery of statutory penalties for mining coal within the area along a boundary line in which mining, without the consent of the adjacent owner in writing, is prohibited by statute, and the other for the recovery of the value of coal mined by the plaintiff beyond the boundary line and in an area covered by the lease of the defendant in this case, as well as the value of additional coal rendered inaccessible by the operations beyond the line and so lost to the lessee.

Neither party actually owned the coal in the land on which it was operating. The plaintiff was the lessee of the West Virginia Central and Pittsburgh Railway Company, by assignment of a lease made to the Denman Coal Co. and the defendant the lessee of H. C. Homan, as to the tract of land encroached upon. The declaration in one of the actions at law claims right of recovery of fifteen $500.00 penalties, on the theory of fifteen separate violations of the statute inhibiting mining operations within five feet of a boundary line, without the consent in writing of the adja-

cent owner. In the other declaration, compensation for 6,900 tons of coal alleged to have been mined by the plaintiff in this bill, out of the Homan lands, of the value of $9,660.00, is sought, and, in addition thereto $2,068.00, as the value of 4,136 tons of coal, rendered, inaccessible by the wrongful operation.

By way of equitable defense to the two actions at law, the original bill alleges two grounds of relief, an agreement between the two companies permitting the plaintiff to mine not only within five feet of the boundary line, but also beyond it, so as to form a connection between its works and those of the defendant, and, in the event of failure of proof of the agreement, conduct on the part of the defendant inducing such action by the plaintiff and constituting estoppel to enforce the penalties for violation of the statute and to have compensation for the coal taken out beyond the boundary line, in excess of a reasonable royalty thereon. An amended bill relies upon the statute of limitations, as to the penalties, and alleges facts constituting ground of necessity for a survey to determine the exact location of the boundary line and the quantity of coal removed.

Since the statute of limitations, if applicable, may be relied upon in the action at law, as fully and effectively as in this suit to enjoin that action, it obviously constitutes no ground of jurisdiction or relief here. Whether there was such an agreement as the orriginal bill alleges, or such conduct as constitutes an estoppel in equity, are the only material inquiries in the cause. The lease under which the plaintiff operates was executed July 1, 1903, and the Denman Coal Company had conducted mining operations under it for a number of years, prior to May 6, 1912, on which date it assigned the lease to the plaintiff. While the Denman Coal Company was conducting its mining operations under its lease, the Abrams Creek Coal and Coke Company, the defendant here, was mining under its lease of the adjacent Homan land. The evidence well establishes the fact that the general manager of the defendant company carried on some negotiations with the Denman Coal Company, for disposition to it of the area of coal in question here, about

three acres, as well, possibly, as some other small portions, because they were so situated as to prevent ready and economical mining under the plan of operations contemplated by him; and that, after the Carroll-Cross Coal Company took over the works of the Denman Coal Company, these negotiations were continued.    A. Spates Brady, who was general manager of the Abrams Creek Coal and Coke Company from April, 1910; until September, 1913, testified that, when he took charge of the property, its plans of operation were unskillful, ineffective, wasteful and unsatisfactory, and that he altered them by dispensing with some of the openings and reducing their number and so connecting them up as to effect a great saving in expenses; and that the plan he adopted contemplated disposition of certain small portions of the coal to adjoining operators who could take them out more economically, by exchanges of coal property, mutually advantageous to the parties.    He says he prepared the plans of operation, as contemplated, and furnished a copy thereof for the use of the president and board of directors, and that it indicated purpose and intention to dispose of the coal in question here to the Denman Coal Company.    The reason assigned by him for this purpose was the impracticability of profitable mining thereof, because of the necessity of mining it towards the "dip," in consequence of which the headings, entries and rooms filled with water, as the work progressed, which had to be removed by pumping, and the existence of a squeeze or breaking down of the roof, which made it necessary to abandon the headings through which the coal from that area had to be taken out.    It appears from other evidence in the cause, that the cost of a new entry so made as to give access to this coal and drain certain portions of the workings would have been altogether out of proportion to the value of the coal to be taken out through it.    In view of this situation, A. Spates Brady says he intended, as general manager, to let the Denman Coal Company take that coal out through its workings, in exchange for some of its coal, to be taken out through the workings of the Abrams Creek Coal and Coke Company, so as to relieve the latter of the obligation imposed by its lease

to take it out and pay the royalty thereon, and also afford means of draining his company's mines through the workings of the Denman Company. He swears that, some time in 1912, in pursuance of this plan, which the president and directors of this company had approved, he approached representatives of the Carroll-Cross Coal Company and endeavored to trade to them this "fag end" for an equal area of coal lying in front of some other works of his company. His proposition was not accepted at that time. In the fall of 1913, M. P. Gannon, succeeded him, as general manager, and the proof is that he, being familiar with the plan by reason of his having previously held a subordinate position under Brady, had conversations with representatives of the Carroll-Cross Coal Company, sometime in 1914, which are relied upon in the evidence as constituting an agreement authorizing the plaintiff to mine the coal in question. Carroll Pattison, president of the plaintiff company, says Spates Brady discussed his plan with him on several occasions and sometimes in the presence of Gannon, and that, after Brady left, Gannon renewed the proposition and he accepted it for his company. As to the terms of the arrangement, he is very indefinite, not saying whether the coal was to be exchanged or to be taken out on a royalty basis, but he says the proposition previously made by Brady was one of exchange. Howard Cross, superintendent of the Carroll-Cross Coal Company, says Gannon came over to his mine and, together with himself and his brother Harry Cross, sat down on a pile of props at the mouth of the mine and proposed that the plaintiff company take out the coal and pay a royalty for it not exceeding six cents per ton. Harry H. Cross says he heard Gannon tell his brother to go a head and take out the coal and it could be settled for afterwards on a royalty or exchange basis satisfactory to both parties. Pattison says they began to act upon this request or agreement in January 1914, but Howard Cross says they did not begin to do so until about June 1st. of that year. The mining within the prohibited area and beyond the line continued until about June 1916, when it was ascertained by an auger hole bored beyond the workings that a point within five or

six feet of the old workings of the Abrams Creek Coal and Coke Company had been reached. This fact having been communicated to the superintendent of that company, James Christopher, and an inquiry made as to the identity of the heading approached, he reported it to Samuel D. Brady, president of the company, who, professing surprise at the conduct of the Carroll-Cross Coal Company, in crossing the line with its operations, immediately filed a protest against further operations and a demand for satisfaction for the alleged trespass upon the property of his company. As evidence of probability that Spates Brady's plan and the alleged negotiations in conformity therewith were known by S. D. Brady, the plaintiff relies upon correspondence between the latter and Pattison, in 1915. In a letter dated April 10, 1915, Brady said he believed some kind of an arrangement could be made by which some of the coal adjoining the Carroll-Cross Company's property could be mined by it and the drainage more economically handled for both companies and requested a blue print showing the workings of the company, with a view to joining up the maps of the two companies and working out a plan for discussion. Pattison replied in a letter dated April 14, 1915, saying he was unable to find a map of the old Denman Coal Company workings, but the proposition would suit him, if he could arrange for permission by the railroad company, to take the coal out through their property. Brady says this correspondence related to other coal lying beyond the rock fault. As showing improbability of this it is noted that Brady had not then commenced work at the place he mentions.

Some of the claims relied upon by the plaintiff, as showing the desirability and practical necessity of the disposition of the coal in question, which A. S. Brady says he contemplated, are disputed and put in issue by numerous contentions of the defendant. Gannon, with whom the agreement is alleged to have been made, died in December 1915, wherefore his testimony either to affirm or deny that of the witnesses of the plaintiff cannot be had. S. D. Brady, says the correspondence between Gannon from Oakmont, at or near which the mines were operated, and the principal of-

fice, located at Fairmont, West Virginia, contains nothing pertaining to the alleged agreement; and James Close, the clerk at the Oakmont office of the company during the period of management by Gannon, and having charge of the correspondence, swears there was no correspondence between the general manager and the president of the company, relating to any such agreement or the subject matter thereof. S. D. Brady and Christopher, the superintendent, and other witnesses admit that there was some water in the rooms or headings of the Abrams Creek Company, abandoned about the year 1910 and up to which the plaintiff extended its operations between June 1914 and June 1916, but all of them swear it did not constitute a serious obstacle to mining operations in that section, because it could be disposed of with a small pump and did not have to be carried any considerable distance by means of the pump. The coal actually mined beyond the line by the plaintiff was not all the coal the defendant had in that section. All of the impediments to the mining of that coal applied to a considerably larger area of which it constituted a part; and S. D. Brady attributes the abandonment of the operations in that section to a cause entirely different from the circumstances mentioned and relied upon by the plaintiff. The defendant held leases upon two adjacent tracts of land, one belonging to Homan the other to Kalbaugh and Ambrose. The minimum amount of coal to be mined annually under the Homan lease was 25,000 tons and that to be taken out by the other lease 15,000 tons. As to the Homan lease, the company was largely in default, but, as to the other, the obligation of the lease respecting the amount of coal to be mined, had been fully complied with. This situation made it necessary or desirable to direct the efforts and energies of the company more fully to the development of the operations on the Homan lease, to avoid the necessity of payment of royalties for coal not mined. As a circumstance tending to contradict this plausible theory, the plaintiff relies upon the fact that the coal actually taken out by it was on the Homan lease and not on the Kalbaugh and Ambrose lease. But it is to be observed, that nothwithstanding this fact, the coal actually

taken out was near the boundary line between the two leases
and successful operations in that section may have required
operations on both leases, while the exigencies of the situa-
tion may have required all of the energies and efforts of the
company to be directed to the mining of coal on the Homan
lease.   As to the squeeze mentioned by A. S. Brady, other
witnesses deny its existence.   Christopher, the superintend-
ent, swears that neither Spates Brady nor Gannon ever in-
formed him that the Carroll-Cross Coal Company was min-
ing over the line so as to connect with the old workings of
the company, and that he had no knowledge of their having
done so until he was informed that these headings had been
actually tapped by such mining.

The final decree merely dissolving the injunction and dis-
missing the bill gives no indication of the ground upon which
the decision rests.   From argument found in the briefs, it
may be inferred that the trial court proceeded upon the
theory of lack of authority in Gannon to make the agree-
ment claimed and, for that reason, ignored the evidence tend-
ing to establish it.   On the other hand, the trial judge may
have deemed the evidence insufficient, in view of its indefi-
niteness and the uncertainty as to its terms and the facts
and circumstances tending to contradict it.   A loose con-
versation does not always amount to a contract.   If the for-
mer suggestion is sound. the trial court's view of the evi-
dence becomes immaterial, unless it tends to prove ratifica-
tion in some way.   In other words, if Gannon had no author-
ity to make such an agreement as the plaintiff claims and
his making thereof was not ratified in any way by his prin-
cipal, it amounts to nothing in law.   Though the powers of
a general manager are large and extensive, Fletcher's Ency.
Corp. secs. 2096 and 2098, they are not unlimited.   It is the
province or function of a general manager to supervise and
conduct the ordinary business of his principal, and whether
an act falls within his implied powers, depends upon whether
or not it is within the ordinary business intrusted to his
management.   Fletcher, Ency. Corp., Sec. 2102; *Varney &*
*Evans* v. *Hutchinson Lumber & Manufacturing Co.,* 70 W.
Va. 169; *Laing* v. *Price,* 76 W. Va. 192.; *Haupt* v. *Vint,* 68
W. Va. 657.   In all the instances in which this court has sus-

tained the theory of implied authority in a general managing officer of a corporation, the subject matter of his act has been something that arose in the conduct of the ordinary business of the corporation. *Thomas & Moran* v. *Kanawha Valley Traction Co.*, 73 W. Va. 374; *Union Bank & Trust Co.* v. *Long Lumber Co.*, 70 W. Va. 558; *Producers Coal Co.* v. *Mifflin Coal Mining Co.*, 82 W. Va. 311. The subject matter of the alleged agreement between Gannon and the plaintiff was not within the course and conduct of the ordinary business of the corporation he represented. It was his business to conduct the mining operations of his principal, the digging and selling of coal, employment and direction of the necessary labor, payment of wages and the like; and the gift, sale or release of a portion of the mining territory to another corporation was clearly not within his province. The leasehold of his corporation was a part of its permanent plant which he could not dispose of. Whether it was of such character as would enable him to make a profit out of it for his principal was a question pertaining to the general policy of the company not one arising in the course of the conduct of its business, as defined by its charter, by-laws and nature. The act imputed to him was not in any sense analogous to the employment of another corporation to mine the coal for his principal. At the best, it was a sale of the coal in place or of the right to mine it, at a price that would yield no profit to the owner. As interpreted by the witnesses who testify to it, the agreement was to yield no more than sufficient money to pay the royalty to the lessor, in exoneration of the lessee's obligation to take out the coal and pay the royalty. The only other benefit suggested was the advantage of drainage through the adjacent lease-hold, and it was clearly not within his authority to obtain that advantage by a gift, sale or barter of a part of the permanent plant of the corporation. Whether he could purchase such right, paying money for it, is a question of an entirely different character, which does not arise.

On the question of express authority in Gannon to make the agreement, the evidence does not preponderate in any degree against the finding of the trial court. On the contrary, there is a very decided preponderance in favor of it.

S. D. Brady swears neither he nor the directors ever conferred it or knew it was claimed or asserted. The clerk in charge of the correspondence between the office at the mines and the principal office never heard of it. Nor has any evidence of it been found in any of the correspondence which was produced and offered to one of the plaintiff's attorneys for examination. Moreover, the exchange of letters in April, 1915, several months after the plaintiff claims to have commenced work under the agreement, imports lack of such knowledge on the part of S. D. Brady. Whether it related to the coal in question or not, it seems to have carried an original proposition from Brady, and not an additional one. It is also significant that no report of the amount of coal taken out through a period of about two years was ever made and that royalties on it were paid to plaintiff's lessor, as if the coal belonged to it, instead of the defendant to whom they belonged. In this state of the evidence, the finding of the trial court cannot be disturbed.

Nor is there any evidence of ratification of the unauthorized agreement, if made. Though it might have been beneficial to the defendant, if accepted, it has not been a recipient of the benefit thereof in any way. It has declined compensation for the coal in money and forbidden the connection which would have given it the benefit of drainage through the plaintiff's workings.

Gannon's lack of authority respecting the subject matter of the alleged agreement is the rock on which the argument of estoppel breaks. His lack of authority to make a representation concerning it is as clear as his want of authority to make an agreement. The party claiming the benefit of an estoppel must have acted upon some representation in such manner as to work an injury to himself, in the event of the failure of the representation relied upon. Being a matter of law, Gannon's lack of implied authority is deemed to have been known by the plaintiff, and action upon the mere assumption of his express authority, without evidence of it, was action at the peril of the plaintiff. It was bound to know he had no authority, unless expressly conferred, and also to ascertain whether it had been so conferred. *Thomp-*

*son* v. *Mercantile & Mfg. Co.*, 60 W. Va. 42.  Assuming constructive knowledge of the encroachment on the part of the defendant through Gannon, its general manager and director, this does not amount to an estoppel, for mere silence operates as an estoppel only because it is sometimes a form of representation. *Williamson* v. *Jones*, 43 W. Va. 562; 14 Am. & Eng. Ency. L., 643.  There is no proof of any reliance of the plaintiff upon the silence of the defendant, in ignorance of the rights of the latter.  Its title, as well as Gannon's lack of authority, was beyond question and fully known.  Hence, the plaintiff could not have been misled by the silence of the defendant after notice of the trespass, and one claiming a right by estoppel must show that he has been misled by the words, acts or conduct of the other party, while ignorant of his rights.  He must be governed by his own knowledge, even though a representation to the contrary may have been made by the other party.  In other words, he must have been misled to his injury, and it is impossible that he should have been, when he was fully informed as to the facts.  *Norfolk etc. R. Co.* v. *Perdue*, 40 W. Va. 442; *Water Co.* v. *Browning*, 53 W. Va. 436; *Akinson* v. *Plum*, 50 W. Va. 104; *Dawson* v. *Grow*, 29 W. Va. 333; *Thor* v. *Oleson*, 125 Ill. 365; *Bartlett* v. *Kander*, 97 Mo. 356; *Crest* v. *Jack*, 3 Watts (Pa.) 240; 10 R. C. L. p. 694, sec. 21.  Estoppel.

The defendant's depositions having been taken before it filed its answer, a motion to suppress them was interposed, but not passed upon.  In view of the probability that the motion would be sustained, it retook them, and, on the hearing, a motion to suppress those taken after the filing of the answer, was made, on the ground of lack of right to take them while the former motion was pending and without leave to retake.  The court sustained the first motion and overruled the second in the final decree, reciting that the parties had been advised before the depositions were retaken, that the first motion would be sustained and leave granted to retake the depositions.  At the retaking thereof, the plaintiff appeared and cross-examined the witnesses.  The error, if any, was clearly harmless and does not call for a reversal

of the decree. The merits of the cause were as fully developed as if the procedure had been strictly regular.

Perceiving no error we will affirm the decree.

*Decree affirmed.*