# CHARLESTON.

JESSIE ROBERTS *v.* J. T. CROUSE *et al.*

Submitted April 12, 1921.   Decided September 13, 1921.

1.   CURTESY—*A Tenant by Curtesy Not Made a Party to Summary Sale of Ward's Lands Through Special Commissioner, but Joining in Deed After Confirmation Not Knowing of His Curtesy May Assert Such Interest in Guardianship Funds.*
   In statutory summary proceedings to sell, first, the mineral in, and, afterwards, the surface of lands belonging to infants,

in which it is stated that the wards are the sole owners and that the rights of no other person will be affected by the sales, and mineral and surface are so sold for full value agreed upon by the guardian and purchaser before the proceedings are begun, and so ascertained and decreed by the court, and the father of the infants, who is tenant by the curtesy in the lands, is not made a party to said summary proceeding, but after sale is made and confirmed and deed through special commissioner is directed, he joins in the deed to the purchaser, he is not thereby precluded from asserting and receiving his curtesy interest in the funds in the hands of the guardian; although when he joined in the deed he believed that he had no curtesy or other interest in the land.   (p. 20).

2.   SAME—*Tenant's Right in Funds of Which he was Guardian Held Not Barred by Limitation and Laches.*

In such case, the guardian and tenant by the curtesy being one and the same person, the tenant by the curtesy is not estopped from asserting his curtesy interest in the funds in his hands as guardian, upon settlement of his guardianship accounts with one of his children when she has become 21 years old, under the doctrine of limitation and laches, it appearing that no loss of evidence, no changed conditions, and the rights of no other person have intervened.   (p. 23).

3.   SAME—*Father and Guardian of Children Not Precluded From Asserting Right of Curtesy Against Fund for Sale of Land.*
Ignorance of the father and guardian of his right of curtesy at the time of the sales and his consequent failure to then assert and have the same judicially determined, being a mistake of fact will not preclude him from asserting his right against the fund upon final settlement, there being no judicial admission nor judicial finding in the summary proceedings that he does not have such curtesy.   (p. 27).

(RITZ, PRESIDENT, dissenting.)


Appeal from Circuit Court, Fayette County.

Action by Jessie Roberts against J. T. Crouse and others. Decree for plaintiff, and the named defendant appeals.

*Reversed and remanded.*

*Dillon & Nuckolls,* for appellant.
*Hubard & Bacon,* for appellee.

LIVELY, JUDGE:

J. T. Crouse conveyed 79½ acres of land in Fayette County to his wife in March 1898, and on November 2, 1898 she died intestate, leaving five infant children, the youngest of which, Jessie, then of very tender years, and who afterwards married Roberts, is the plaintiff in this case.    Crouse qualified as guardian for his children, and in 1901 E. B. Hawkins, who was buying, or taking options on, coal lands in that vicinity, offered him $20.00 per acre for the coal and minerals under the 79½ acre tract.    Crouse, as guardian, filed a petition in the circuit court, asking for the sale of the coal and mineral and made the five children, his wards, the only parties defendant thereto, alleging the death of his wife, intestate, her ownership of the land, the names and ages of the infants, his appointment and qualification as guardian, the offer by Hawkins to purchase the coal and other mineral at $20.00 per acre; that the offer was a fair and adequate price, equal with and in some cases more that the sale price of adjacent coal lands; and alleging that the sale of the interests of the infants therein would promote their material welfare; and that the rights of no one other than petitioner and his wards would be affected by a sale.    The petition prayed for a sale of the entire interests of the infants in the coal and other minerals.    Notice was duly served on each of the infants and to the effect that the petition would be filed at a special term of the court ''asking for a sale of the coal and mineral under the tract of land of which Sarah J. Crouse died seized, and the title to which was acquired by you as heirs-at-law of your mother.''    Regular proceedings were had on the petition and witnesses were examined from which the court determined that the welfare of the infants would be promoted by a sale of their interests in the coal and other minerals, and that the Hawkins offer of $20.00 per acre was a fair and adequate price for the coal and minerals; and decreed the sale of the entire interests of the infants therein, and that the said coal and mineral be sold at that price or at a greater price if obtainable by the guardian either at public or private sale. The guardian reported that he ''sold the coal and other minerals

at private sale to Hawkins at $20.00 per acre,'' and that he deemed the sum derived a fair and adequate price for the same.     The sale was confirmed and a special commissioner was appointed and directed to make a deed to Hawkins for the ''coal and other minerals underlying the said 79½ acres of land as described in these proceedings.''

Similar proceeding was had in 1902 for a sale of the surface of said tract, except 13.2 acres around the Crouse residence, in which the petition states that an offer has been made by the Stuart Colliery Company at $75.00 an acre cash, a price in excess of the value.     The court, upon hearing, ascertained that it would promote the welfare of the infants to sell their interests in the surface, and that the offer of $75.00 cash was a fair and adequate price, and would be a fair and adequate one for the infant defendants, and decreed that the surface be sold at that price. The guardian reported that he sold the surface, excepting 13.2 acres, at the price of $75.00 to the Colliery Company, and advised confirmation, stating that the price was more than he had ever hoped to realize for his wards for same.     The court confirmed the sale and directed a special commissioner to convey the entire surface (excepting 13.2 acres) to the purchaser.

In 1908 another petition was filed by the guardian asking for sale of .81 acres surface, part of the 13.2 acres remaining, to Smiley at the price of $500.00, in which it is alleged that the children own the same, each having a one-fifth interest therein (one child having at that time become of age) and that no other person's rights would be violated by a sale thereof; and stating that the infants owned personal estate at that time amounting to about $5000.00, and asking for a sale of the .81 acre.     This proposed sale was not consummated.

Crouse, the guardian and father, never made any settlement of his accounts as such.     The four older children, when they became of age, executed deeds to their father conveying all their interests in their mother's estate to him.     In the year 1919 the plaintiff Jessie Roberts (nee Crouse), having become of age, instituted this suit against her father and former guardian and his bondsmen to obtain her interest in the money derived from the sale of the coal and other minerals

and from the sale of the surface hereinbefore set out, claiming one-fifth of $1590.00 (sale price of coal) with compound interest thereon from January 22, 1901, and one-fifth of $3,545.76 (sale price of surface) with compound interest thereon from December 4, 1902. Crouse avers in his answer that he sold the mineral and surface by the acre and for full value, and that he did not know at the time that he had any interest in the land as tenant by curtesy and was not before the court in his individual capacity either as plaintiff or defendant, and was ignorant of his rights, and was not advised thereof until about the year 1910, when he was preparing to make settlement of his guardianship accounts, he was so informed by A. J. Horan, attorney, with whom he then consulted; that he joined in the deeds by the special commissioners but was paid nothing, and did so at the request of the purchaser, but in ignorance of his rights; that he used $4000.00 of the money he received in placing improvements upon the 13.2 acres which belonged to the children, and as his wards (with the exception of plaintiff) became of age he settled with them and they conveyed to him their interests in the 13.2 acres; and he denies that plaintiff is entitled to one-fifth of the money derived from said sales, but that he is entitled to deduct therefrom his curtesy interest, and then pay her the one-fifth of the remainder. A master commissioner reported that the plaintiff was entitled to receive from defendant $3,705.58, if no deduction was made for his curtesy interest; but that if defendant was allowed curtesy, the amount he was entitled to retain was $1,530.92, which would leave the amount for which she was entitled to recover at $2174.66 as of February 14, 1920. The decree was for the full amount claimed by the plaintiff. From this decree Crouse appeals.

The deed made to Sarah Crouse from J. T. Crouse conveying the 79½ acres was for the consideration of love and affection, and was made by Crouse at the suggestion of some neighbor to delay the payment of a debt of about $80.00, which he then owed, and which he afterwards within a few months paid. There was a balance of purchase money, about $200.00 owing on the land, which he paid after the deed was made to his wife. She owned no personal estate

at the time of her death, and the funeral expenses, nurse's and doctor's bills were paid by defendant, amounting to a considerable sum, the allowance of which was refused by the lower court and these bills are not insisted upon here; also about $200.00 expenses connected with the sale of the mineral and surface, which Crouse paid and for which he received no credit. The disallowance of all these items is not insisted upon as error and will receive no consideration. The only question is whether or not Crouse is barred from curtesy in the proceeds of the sale of his wife's land under the facts detailed.

Plaintiff contends (1) that defendant's curtesy was not sold in the two summary proceedings to sell the interests of the infants, and that he conveyed his interest as tenant by the curtesy when he joined in the deeds, although he received nothing therefor, and is now estopped from taking it out of the moneys paid in by the purchasers; (2) that although he was ignorant of his curtesy interest at the time of these sales, his ignorance of the law is no excuse, and cannot now inure to his benefit; (3) that he waived his curtesy interest in favor of his children; (4) that having given bond and received the money as guardian he cannot now claim any part of it as his own; (5) and that he is barred by the statute of limitations and laches.

All of the contentions of the defendant are based upon the claim that he was ignorant of his curtesy in the land he had deeded to his wife. A study of the record leads to the conclusion with reasonable certainty that he did not know that he had any interest therein. The two summary proceedings for sale of the coal and surface proceeded upon the assumption and theory that the land was owned entirely by the infants. In the first proceeding the coal and other minerals are alleged to be "owned by his wards," and that the rights of no other person will be affected by a sale; and in the second, the averment is made that after the mineral underlying the land had been sold, the children and wards were but the owners of the surface only. The mineral was sold by the acre at $20.00 per acre, which the court ascertained from the evidence was its entire worth; the surface was also sold by the acre at

$75.00 per acre, likewise ascertained to be the entire worth. The reports and decrees so state.   The petitions alleged offers from the purchasers for the coal and surface by the acre at stated prices found to be the full, true and actual value. Militating against the claim of defendant that he did not know that he had any personal or private interest in the land is the fact that he joined in the deeds to the mineral and surface in his individual capacity with the commissioners appointed by the court.   Asked why he did so, he replied that the lawyer told him it was necessary, and asked why he, the witness, thought it was necessary for him to sign he replied, ''From the fact that when people convey property they make deed to it.''   He was one of the principals in the transactions.   The price and terms were agreed upon by him, and it was but natural for him to conclude that he should make or join in the title papers.   The trained lawyer does not always comprehend the intricacies of inheritances and the laws governing infants' estates.   Can better results be expected from the layman who has had no experience and has given the subjects no thought?   Indicative that he did not know of his personal interest even after being called upon to sign these deeds in his individual capacity in 1901 and 1902, he again filed a petition, sworn to, in the year 1908, asking for a sale to Smiley of .81 acre of the land at $500.00, in which he stated that his five children were the *sole owners,* each having a one-fifth interest therein, ''and that the rights of no person will be violated by a sale of said interests of said infants in said real estate.''   We conclude that defendant was ignorant of his curtesy interest.   The record and his actions sustain his sworn declaration to that effect. · He swears that his first knowledge of his right of curtesy came to him through Hon. A. J. Horan, an attorney then at Fayetteville, whom he consulted about the year 1910, when Horan made a rough calculation of his interest in the fund in his hands, based on his age at the time the sales were made.   At that time he was making a settlement with one of the older boys who had become of legal age.   Horan does not contradict this evidence.   But it is argued that the court directed a sale of the interests of the children in the coal and surface, and

did not direct a sale of the curtesy interest of defendant, and could not have done so, and the purchasers purchased nothing but the interest of the infants for which they agreed to pay and did pay $20.00 and $75.00 per acre.    That is true, but these purchasers offered and agreed to pay these fixed sums per acre for the coal and surface as the full value thereof, and they did receive for the sums paid the entire interests.    It was immaterial to them whether the court's decree and deed conveyed the entire value purchased by them, or whether their complete title was conveyed to them by the joint deed of the commissioners and the tenant for life.    It is safe to say that there would have been no sale at $20.00 per acre for coal and $75.00 per acre for surface without the full title being assured to them.    The purchasers did not want the coal or surface at some indefinite period dependent upon the death of the life tenant.    They were not purchasing the reversionary interest. They were buying the entire property with an intention of immediate occupation and use.    The full value of the property could be easily ascertained; but the value of the life estate, and that of the remainder would be uncertain,   dependent upon the uncertainty of life and death.    Property thus owned is not usually sold in piecemeal.    The sales were private and by agreement of all the parties and the court. The evidence both at the time of the sales and now is conclusive that full value was realized for the property.    There is a statement by Joe Huddleston, the uncle by marriage of the plaintiff and at whose home she was reared, that defendant told him, after the mineral and surface were sold, that he knew of his curtesy right in the land but wanted it to go to the children.    This is denied by defendant, who says that he intended all of his property to go to his children eventually. But the time of the alleged declaration is hazy and uncertain and even if made would not operate as a transfer of his title, or a gift of the money.    A parol gift must be accompanied by delivery.    He still has the money in his possession and control.    It is unquestionable that Crouse had curtesy in the land.    What became of it?    The answer will be that he conveyed it to the purchasers when he joined in the deeds.    What consideration did he receive?    Can we say that he intended

to give it to the purchasers ?    We suspect that common sense
will answer, no.    The record is replete with proof that they
paid full value.    It is clear that his curtesy was converted
into money and became a part of the funds in his hands.    In
the summary proceedings no provision was made for his
curtesy interest, no ascertainment thereof.    Is he estopped
from claiming it now after all these years?    This is the
crucial question.    It will be noted that he was not a party,
in his individual capacity, to either of the summary    sale
proceedings.    The allegations were, and the court proceeded
upon the theory, that the infants owned the entire title, and
that the rights of no other person would be affected by a sale
thereof.    Crouse was the moving cause it is true, but he act-
ed as guardian and not in his individual capacity. He asserts
that he did not know that he had a personal interest, and the
record bears out his assertion.    The offer was for the title to
the coal at a specific price per acre, and for the title to the sur-
face at a fixed price per acre.    The court ascertained  and
adjudicated the value of both coal and surface, and not for
an undivided interest therein.    The reports of sale were that
all of the coal and surface had been sold at these prices; and
the decrees directed that the commissioner make a deed con-
veying to the purchaser "the coal and other minerals under-
lying the 79½ acres of land described in these proceedings;"
and make a deed conveying to the purchaser "with covenants
of special warranty of the surface of the 78.55 acres of land
described in the petition in this cause."    Had Crouse as-
serted his claim in these proceedings then there could  have
been no doubt of the result.    But the plaintiff vigorously
insists that he is now barred by limitation and laches.    The
defense of laches implies injury to the person pleading it,
brought about by loss of evidence, death of some of the par-
ties to the original transaction, changed situation, or the in-
tervention of the rights of other persons.    *Cranmer* v. *Mc-
Swords,* 24 W. Va. 594.    Lapse of time is not sufficient alone.
It must be accompanied by some injury or disadvantage to
the opposite party, or by some conduct indicating abandon-
ment of the claim, the re-assertion of which will inure to the
benefit of the claimant by reason of changed conditions. *Lil-*

*lian Mitchell* v. *John Cornell,* 88 W. Va. 194, 106 S. E. 866, and cases cited. Courts show the utmost leniency for laches and lapse of time where intimate personal relations exist, or where family relationship exists between the parties. 10 R. C. L. p. 402. "Laches cannot be imputed to one who is ignorant of his rights. Nor is mere delay always to be considered as laches. The relations of the parties, their degree of kindred, the inability of the debtor to pay, and other circumstances may be taken into consideration, and where it is clearly shown that the delay has worked no injury and can be satisfactorily accounted for, courts of equity will not allow it to defeat the recovery of a debt shown to be due and unpaid." *Jameson* v. *Rixey,* 94 Va. 342. Mere lapse of time unaccompanied by evidence that the right has been abandoned does not constitute laches in equity. *Cranmer* v. *McSwords, supra; Tidbale* v. *Shenandoah Nat. Bank,* 100 Va. 741. Where a transaction has not become obscure, and does not depend upon frail memory or the imagination of witnesses, as will likely produce injustice, and the sum in controversy is certain, lapse of time alone is not sufficient to move equity and good conscience to refuse relief. In what particular has the right of the plaintiff been prejudiced by failure of the father to claim his curtesy interest? The data for ascertaining his interest is fixed by the decrees, by documentary evidence. It is as easily ascertained now as at the time of the sales. It does not depend on the memory of witnesses. The parties are all living, and there has been no intervention of the rights of third parties and no change of circumstances that would affect the claim. Defendant did not discover his right to curtesy, or that he ever had any such right, until about 1910, when he was making settlement with the oldest boy, who had reached his majority. As the children became of age he accounted with them and settlements were effected. The plaintiff was yet under age and no settlement could be made with her. Her money was in his hands drawing compound interest. Against whom could he make his demand? How could he assert his curtesy claim against the minor? What advantage has he taken by waiting until she was *sui juris?* As soon as she became of age and desired

settlement he promptly asserted his claim, and offered to pay her her money with compound interest, after taking out of the funds in his hands his curtesy interest. Moreover, it must be remembered that this land was partly inherited by defendant from his father's estate and full title obtained by purchases from his co-heirs, and part of the purchase money paid after the deed was made to his wife in 1898. It was by virtue of this deed of gift to his wife for "love and affection" that plaintiff obtained inheritance therein. Besides, the money which came into the hands of her father was expended in the erection of permanent improvements upon the remaining 13.2 acres in which she has a one-fifth interest in remainder. We do not think the doctrine of limitation or laches can apply to defeat defendant's claim.

It is reasonably clear, and we so decide, that defendant was ignorant of his curtesy in the land at the times when he instituted the summary proceedings as guardian, and did not know of his interest until about 1910. Does the fact of his ignorance of the law and fact create an estoppel? The often quoted rule that "ignorance of the law excuses no one" is subject to many exceptions and modifications as firmly established as the rule itself. 10 R. C. L., p. 306. " 'Ignorance of the law excuses no one', is a maxim of public policy and wise, and yet often operates to shield injustice and operates harshly on the innocent and ignorant; and hence the rule is guardedly laid down by the courts, leaving an open door that courts of equity may, in particular cases not be shut out from the capacity to prevent real injustice." *Schuttler* v. *Brandfass*, 41 W. Va. 204. The doctrine is discussed in Pomeroy's Equity Jurisprudence, vol. 2, sec. 849, and the author lays down the following general rule: "Wherever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relation, either of property or contract or personal *status*, and enters into some transaction the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or

affirmative, treating the mistake as analagous to, if not identical with, a mistake of fact.'' Mistakes respecting the title or interest in real estate most frequently illustrate an exception to the general rule, that ignorance of the law excuses no one. 10 R. C. L. 311; *Irick et ux.* v. *Fulton's Ex'ors,* 3 Gratt. 193; *Burton* v. *Haden,* 108 Va. 51.

It is asserted that because defendant gave a bond for the money which came into his hands by virtue of the sales in a penalty double the amount he is thereby estopped from denying that the money so received by him belongs to the infants, and therefore he must account to the plaintiff without any diminution on account of his claim for curtesy. It is a basic element in equitable estoppel that the act relied upon must be injurious, and prejudicial to him that asserts it as an estoppel; his position must be changed for the worse by relying upon or acting upon the act or conduct of the person against whom he claims estoppel. *Bates* v. *Swiger,* 40 W. Va. 420; *Bettman* v. *Harness,* 42 W. Va. 451; *C. & O. Ry.* v. *Walker,* 100 Va. 69. ''Equitable estoppels only arise when the conduct of the party estopped is fraudulent in purpose or unjust in result * * *. The fundamental principle upon which this doctrine is based is the equitable one—the suppression of fraud and the enforcement of fair dealing.'' Herm. Estop. 862-865. We fail to see where defendant has acted fraudulently in giving this bond or wherein the plaintiff has acted or been misled to her injury. That defendant may have been under a misapprehension as to his relationship to this fund, or under the impression and belief that he had no personal interest therein, does not estop him from showing the true facts afterwards ascertained. No one has been prejudiced by the giving of this bond, and the doctrine of estoppel does not apply. *Davis Trust Co.* v. *Price,* 77 W. Va. 681. The giving of the bond conditioned for the faithful accounting of the fund would not operate to change the true character or ownership of the money. The guardian, unlike an administrator or an executor, has not legal title to the ward's property. He is a trustee but his powers are limited to mere custody and control of the property as property to which the ward has full and complete title. 21 Cyc

pp. 77 and 78. Possession by the guardian, therefore, of a fund in which both he and his ward have interests or titles, is not inconsistent with assertion of his title, at least not conclusively so. Legally the fund in question was an inseparable one, until settlement. The guardian had a life estate in it and the ward an estate in remainder. Hence, it signifies little whether he held it in possession as guardian or in his individual name. He had a clear right to hold the entire fund in his own name. The interest of the wards was ground or reason for his holding as a fiduciary, although he was not bound to do so. A liquidated debt, or an encumbrance on the ward's estate, if clearly proved, may be credited against the funds held by the guardian. 15 Am. & Eng. Ency. Law, p. 111; *Wallis* v. *Neale,* 43 W. Va. 529; *Snowhill* v. *Executor of Snowhill,* 2 N. J. Eq. 38 *Mathes* v. *Bennett,* 21 N. H. 204.

This leaves nothing in the way except the admissions in the summary proceeding and they are not conclusive. That proceeding was not one between the guardian on the one hand and himself on the other. In his individual capacity he was no party to it. His deed does not bind him as between himself and his ward because it was not made to the ward. It conveyed his estate to a third party. Are the statements, in the summary proceedings, to the effect that the wards owned the entire interests in the mineral and surface, and that the rights of no other person would be affected by a sale thereof, conclusive judicial admissions, whether made by Crouse as guardian or as an individual? The petitions on their face controvert the assertion of whole title and interest in the children and wards. It is stated therein that Sarah J. Crouse, the wife of petitioner, died intestate seized and possessed of the tract of land. The curtesy of the husband therein, while not alleged in terms, is a conclusion of law from the statement of fact. "Statements or admissions relating to a question of law are not admissible in evidence for the reason that a party should not be affected by statements which may be attributed to a misapprehension of his legal right." 22 C. J. p. 298, sec. 325. While judicial admissions are strictly construed and are usually binding in the case where made, they do not have the same force of conclusive-

ness in another case, but are regarded as being in the nature of extra-judicial admissions. 22 C. J. p. 329, sec. 370, title "Judicial Admissions". A party to an action is not concluded by an admission made by him or by one whose admission affects him, in the course of another action, but such admission may be explained or contradicted." 22 C. J., p. 423, sec. 506; 1 R. C. L., p. 499, sec. 40.

This is a case which strongly appeals to equity and good conscience. The land originally came to the defendant by inheritance from his father and purchase from his brothers and sisters. Without consideration other than "love and affection" he transferred it to his wife, who died leaving the legal title vested in the five children, subject to his curtesy. An advantageous offer of purchase is made to him, and under a mistake of fact the land is sold for full value without ascertaining or making provisions for his curtesy, in proceedings to sell the remainder interests of the children, to which he was not a party. What has become of his life estate, and if sold from him where is the consideration? Where are the equities? Plaintiff stated in her cross-examination that she was willing to take the part of the purchase money her father was entitled to by reason of his curtesy, together with compound interest thereon, even if a mistake had been made by him in not setting up his claim in the summary proceedings. It cannot be questioned that he was entitled to his curtesy interest, and that it would have been allowed in those proceedings if it had been asserted. She would not have been prejudiced then if he had. She would have received what she was justly entitled to take. Now she wants more—the pound of flesh and the blood. Her inheritance has been enriched by the expenditure of the money received from the sale in permanent improvements on the 13.2 acres remaining. Under our interpretation of the decrees and proceedings had in the summary proceedings we do not think it was the intention or design that the father should lose, or that he has lost, his curtesy, and we hold that he is entitled to receive the same out of the money in his hands. The decree is reversed, and the cause remanded for that purpose.

*Reversed and remanded.*