92 S.E.2d 891 (1956)
Lola L. STUART et al.
v.
LAKE WASHINGTON REALTY CORPORATION et al.
No. 10743.
Supreme Court of Appeals of West Virginia.
Submitted January 24, 1956.
Decided March 14, 1956.
Dissenting Opinion May 28, 1956.
*894 Spilman, Thomas, Battle & Klostermeyer, R. S. Spilman, Jr., Frank T. Litton, Charleston, for appellants.
V. K. Knapp, Winfield, for appellees. *892
*893 HAYMOND, Judge.
In this suit in equity instituted in the Circuit Court of Putnam County in June, 1949, the original plaintiffs, Lola L. Stuart and Laura Harmon, sought an injunction to prevent the defendants, Lake Washington Realty Corporation, a corporation, and Forest Lake Club, a corporation, from causing or permitting the lands of the plaintiffs to be flooded and inundated by the overflow of water from a nearby lake owned or operated by the defendants and to compel the defendants to remove from the lands of the plaintiffs the water impounded upon their lands from the lake of the defendants and to take such action as is necessary to prevent floods and inundations upon the lands of the plaintiffs during periods of freshets and ordinary floods.
The case was heard and determined by the circuit court upon the bill of complaint of the plaintiffs and the exhibit filed with the bill of complaint, the separate answer and cross-bill of the defendant Lake Washington Realty Corporation by which it denied the material allegations of the bill of complaint and, as affirmative relief, sought to require the plaintiff Lola L. Stuart to convey to it the land owned by her upon payment to her of the purchase price paid by her or her husband, C. W. Stuart, for such land, the separate answer of the defendant Forest Lake Club, the special replication of the plaintiffs to the separate answer and cross-bill of the defendant Lake Washington Realty Corporation, the intervening petition of numerous persons owning lots or parcels of land or an interest in lots or parcels of land in the subdivision operated and developed by the defendant Lake Washington Realty Corporation, certain stipulations by the respective parties, the depositions of numerous witnesses produced by the respective parties between February 10, 1950, and October 5, 1950, and the exhibits filed with the depositions.
Before the case was submitted for final decision settlement was effected between the plaintiff Laura Harmon and the defendants and by decree entered December 14, 1950, this suit was dismissed as to her claim.
By final decree entered January 29, 1955, which filed the written opinion of the circuit court dated March 29, 1951, the circuit court, being of the opinion that the plaintiff Lola L. Stuart was entitled to the relief prayed for in her bill of complaint, permanently enjoined and restrained the defendants from causing the land of the plaintiff Lola L. Stuart containing 2.9 acres, on which is located a one story frame dwelling in which she resides, to be flooded and inundated and required the defendants to lower the level of the lake from its present height of twenty feet to seventeen and one-half feet by reducing to the extent of two and one-half feet the height of the dam impounding the water of the lake, and required the defendants to maintain the lake at the level of the dam as so lowered. After the circuit court had announced its decision to grant the injunction but before the decree was entered it denied the motion of the defendants that damages be awarded to the plaintiff Lola L. Stuart in lieu of an injunction and the motion of the defendants that the injunction be limited or modified to the extent that the defendants should be permitted to remove the water from the land of the plaintiff by the construction, within a reasonable time to be designated, of dams or dikes or other barriers on the land of the defendants which would prevent the encroachment *895 of the water upon her land and upon its removal by that method the defendants should not be required to lower the level of the lake. From the decree awarding the injunction this Court granted this appeal upon the petition of the defendants.
As the main controversy involves the conflicting claims of the plaintiff Lola L. Stuart and the defendant Lake Washington Realty Corporation, she will be referred to as the plaintiff and it will be generally referred to as the defendant in this opinion.
There is little, if any, dispute in the material facts disclosed by the record except those facts which relate to the cause of the temporary and recurrent inundation of the land of the plaintiff with water from Hurricane Creek during periods of heavy rainfall in the area through which Hurricane Creek flows. With respect to that question the evidence is conflicting. The plaintiff contends, and the testimony of witnesses introduced in her behalf tends to show, that her land is temporarily and recurrently inundated at frequent intervals and that the cause of the inundation of her land which has several times occurred between June 8, 1947 and September 22, 1950, was the action of the defendant in increasing the height of the dam from sixteen feet to its present height of twenty feet. On the contrary the defendants assert, and the testimony of witnesses produced in their behalf tends to show, that the elevation of the dam to its present height of twenty feet did not cause or contribute to the periodic inundation of the land of the plaintiff but that the cause of the temporary and recurrent overflow of water on her land was the relocation of United States Route 60 by the State Road Commission of West Virginia and the construction by it of the Buff Creek road upon a culvert containing two openings of the width of twelve feet each which together substantially restricted the width of the basin of Hurricane Creek and obstructed the flow of its water in its ordinary course at and above the location of the culvert.
Sometime in 1937 C. W. Stuart, the husband of the plaintiff to whom she was married in 1944, organized a corporation by the name of Stuart Lakes, Inc., for the purpose of creating and developing a real estate subdivision or addition on both sides of Hurricane Creek about midway between Charleston and Huntington in Curry District in Putnam County. According to the original plan formulated by Stuart the subdivision was to contain a large artificial lake of approximately sixty acres which was to be surrounded by approximately seven hundred lots many of which were to front on the lake. Hurricane Creek in the area of the subdivision flows west and the general course of the stream is from east to west. In 1937 United States Route 60 was located near to and north of the creek and extended through a part of the proposed subdivision. The subdivision was to contain 450 acres of land lying on both sides of Hurricane Creek and Stuart Lakes, Inc., purchased and acquired title to a quantity of land which included the 450 acres required for the subdivision and the tract of 2.9 acres now owned by the plaintiff which was excluded from the subdivision for use by the purchaser for other purposes and is situated a short distance north of the former location of United States Route 60 and its present relocation and is approximately one and one-half miles east of and upstream from the dam of the defendant.
After Stuart Lakes, Inc., acquired the land for the subdivision it employed an engineering company to construct a dam across Hurricane Creek at or near the western end of the subdivision and at the instance of Stuart the engineering company prepared a plan for the construction of a dam twenty feet in height to consist of a concrete base sixteen feet in height upon which flashboards to increase the height of the dam an additional four feet were to be erected and held in place by iron pipes inserted in the concrete base. Stuart submitted the plan to the Public Service Commission of West Virginia for its approval and applied for a permit to construct the dam according to the plan. The commission granted permission to construct the dam to an elevation of sixteen feet but withheld its permission to extend its ultimate elevation to twenty feet until a road across *896 Buff Creek, a southern tributary of Hurricane Creek, was raised above the level of the water impounded by the dam when ultimately installed at the planned elevation of twenty feet.
The dam was constructed to a height of sixteen feet in 1938, the lake was formed by water impounded by the dam, and lots were located in the subdivision in accordance with the plan originally designed by Stuart and offered for sale by Stuart Lakes, Inc., to the public with the understanding that the lake would be raised to an elevation of twenty feet by the completion of the dam to that height.
In 1938 the tract of 2.9 acres of land now owned by the plaintiff, which was not included in the subdivision and which was located north of United States Route 60, was conveyed by Stuart Lakes, Inc., to Doctor Henderson who at the time had the right to use certain lots in the subdivision, was familiar with the plan for its development, and knew, as did Stuart, that the completion of the dam to the proposed height of twenty feet would cause water from the lake permanently to encroach and remain upon a portion of the tract of land of 2.9 acres. The deed made by Stuart Lakes, Inc., to Henderson, however, contained no express reservation of any right or easement in the grantor to place or impound water upon the land conveyed and when the deed was made no overflow of water from the lake had occurred upon the tract of 2.9 acres and the grantor had not previously used any part of the land for that purpose.
Owing to financial difficulties Stuart Lakes, Inc., was unable to continue the proposed development of the subdivision. Sometime prior to 1943 it lost its title to the subdivision and Stuart lost his control and management of the project. At the instance of the engineering company, which apparently had not been paid for its work in the construction of the dam, the defendant Lake Washington Realty Corporation was organized and in 1943 and subsequently it became the owner of the subdivision. In the fall of 1945 the defendant undertook to continue and expand the project and requested Stuart to assist in its further development. He and his wife, the plaintiff, established their residence at or near the subdivision and shortly after the first of the year 1946 he was employed by the defendant to assist in the engineering work in connection with the subdivision and to conduct sales of the lots. In March 1946 the plaintiff and her husband together entered into negotiations for the purchase of the tract of 2.9 acres of land which was then owned by the widow of Doctor Henderson and by deed dated March 25, 1946, the property was conveyed to the plaintiff who paid with her own funds the purchase price of $1400.00. On or about August 9, 1946, she and her husband moved into the dwelling on the land and since that date they have occupied it as their residence. At the time the plaintiff purchased the property she was familiar with the proposed development of the subdivision including the elevation of the dam to the height of twenty feet and knew that when the dam was completed to that elevation it would cause the water from the lake to inundate her land.
Stuart continued in the employment of the defendant until the summer of 1946 and while so employed he assisted in locating a line of stakes to show the level of the lake when the dam was completed to the elevation of twenty feet as originally planned by Stuart Lakes, Inc., and as the agent of the company he negotiated and concluded the sale of twenty nine lots which were sold to various purchasers, at prices which in the aggregate amounted to approximately $24,000.00, upon the representation that the level of the lake would be raised to twenty feet by the completion of the dam to that height. The plaintiff assisted her husband in making these sales to the extent of showing lots to some of the purchasers during his absence and in assisting them to meet with him, but she did not at any time act as agent for the defendant or negotiate or conclude for it the sale of any lot in the subdivision.
Before Stuart left the employment of the defendant the flashboards for the completion of the dam were delivered to him but they were not at that time placed upon the dam. Sometime prior to June 8, 1947, the pipes to *897 support the flashboards were installed in the concrete portion of the dam and on February 8, 1948, the flashboards were put in place and the height of the dam and the level of the lake were raised to the originally planned elevation of twenty feet. As the result of the completion of the dam to that height portions of the land of the plaintiff were permanently inundated with water from the lake. The area of one of the flooded portions, according to the evidence introduced by the plaintiff, is 1470 square feet but, according to the evidence introduced by the defendants, is 280 square feet, and the area of the other flooded portion, according to the evidence introduced by the plaintiff, is 290 square feet but, according to the evidence introduced by the defendants, is 65 square feet. At the time the defendant caused the flashboards to be erected it knew that the added elevation of the dam produced by their installation would result in the permanent inundation of a part of the land of the plaintiff with water from the lake.
Between 1946, when the defendant apparently began its new development of the project, and the institution of this suit in June 1949, the defendant, with the knowledge of the plaintiff and her husband and without any protest by the plaintiff until June 1947, sold to many different purchasers a total of 258 lots in the subdivision, including the twenty nine lots sold for it by Stuart, at prices amounting in the aggregate to approximately $215,000.00, upon the representation that the level of the lake when the dam was completed as originally planned would be raised to and maintained at an elevation of twenty feet, and it also expended several thousand dollars in improving and developing the subdivision.
On June 8, 1947, after the iron pipes were attached to the dam but before the flashboards were installed, a flood occurred in Hurricane Creek after a heavy rain and the land of the plaintiff was temporarily inundated to a point within approximately six inches below the front porch of the dwelling; and between that date and September 22, 1950, similar floods occurred periodically which temporarily inundated the property of the plaintiff. During each of these floods the overflow of water from the lake interrupted the ordinary and usual access to the property of the plaintiff from the former location of United States Route 60 in front of the dwelling and caused damage to the surface of the tract of 2.9 acres of land owned by the plaintiff.
The plaintiff contends that the overflow of water upon her land during the flood of June 8, 1947, resulted from the accumulation of brush and debris against the iron pipes on the dam and that the temporary overflow of water upon her land during the floods which occurred after the installation of the flashboards was caused by the completion of the dam to its present height of twenty feet. On the contrary the defendants insist that the temporary overflow of water upon the land of the plaintiff when the floods occurred was not caused by the completion of the dam but resulted from the work performed by the State Road Commission of West Virginia in connection with its relocation of United States Route 60 in and near the subdivision. Because of the susceptibility of the tract of 2.9 acres to inundation from the floods which have occurred since June 8, 1947, the plaintiff has been unable to use and develop the property, which has been divided into ten or more lots, in the manner in which she planned to use and develop it as a subdivision.
After the flood of June 8, 1947, the plaintiff, by letter sent by registered mail dated June 24, 1947, notified the defendant that its construction of the dam to the height of twenty feet would impound water on her property. By this letter she also notified the defendant to desist from any construction of the dam that would impound water on her property or that would subject it to overflow and warned the defendant that it had no right or permission to accomplish those results or to subject her property "to wash or other damage".
Subsequently by letter dated March 25, 1949, also sent by registered mail, the plaintiff notified the defendant "to abate impounding of water" on her property caused by the height of the dam and warned the *898 defendant that its failure to do so would render it necessary for her to take proper action to protect her property against the overflow of water from the lake. At the same time the plaintiff notified the defendant Forest Lake Club which is composed of approximately one hundred and fifty purchasers of lots in the subdivision that the height of the dam impounded water on her property which rendered it unsuitable for certain planned purposes and notified it "to abate any invasion of my rights for which you are responsible by reason of any contracts or conveyances".
It is not disputed that if the present elevation of the dam is lowered as much as 1.9 feet the lots which front on the lake will be rendered practically inaccessible from the lake, the value of all the lots in the subdivision will be greatly and permanently depreciated and impaired, and the defendants and the owners of the lots who, without objection by the plaintiff to the added height of the dam, purchased them upon the representation by the agents of the defendant that the level of the lake would be raised and maintained at an elevation of twenty feet at the dam will suffer heavy financial loss and injury.
The defendants assail as erroneous and seek reversal of the final decree of the circuit court upon these assigned grounds: (1) The defendants have an implied easement to flood the land of the plaintiff; (2) the plaintiff is barred by laches and is estopped to deny the right of the defendant Lake Washington Realty Corporation to raise the dam and to maintain it at the level of twenty feet; (3) the equitable doctrine of the balance of conveniences between the plaintiff and the defendants applies to the facts of this case and defeats the claim of the plaintiff to relief by injunction; (4) the finding of the trial chancellor that the temporary and recurrent inundation of the land of the plaintiff when ordinary floods occur in the area of the subdivision is caused by the elevation of the dam to a height of twenty feet is contrary to the preponderance of the evidence; and (5) the injunction should have been limited to the requirement that the defendants remove the water from the land of the plaintiff by dikes and dams or the decree should have awarded damages to the plaintiff instead of relief by injunction.
Though an easement by implied reservation may be created and imposed upon land when a grantor conveys a part of the land owned by him without an express reservation of the easement if it is the intention of the parties when the conveyance is made that such easement shall exist for the benefit of the grantor upon the land conveyed, the law does not favor the creation of easements by implied grant or reservation. Jones on Easements, Section 134; 28 C.J.S., Easements, § 30. The well established general rule is that there is no implied reservation of an easement when an owner conveys a part of his land over which he has previously exercised a privilege for the benefit of the land which he retains unless the burden upon the land conveyed is apparent, continuous and necessary for the enjoyment of the land retained.
In Jones on Easements, Section 136, the text contains these statements: "There is no implied reservation of an easement in case one sells a part of his land over which he has previously exercised a privilege in favor of the land he retains, unless the burden is apparent, continuous and strictly necessary for the enjoyment of the land retained. A grantor cannot derogate from his own grant and as a general rule he can retain a right over a portion of his land conveyed absolutely only by express reservation." See also Thompson on Real Property, Permanent Edition, Volume 1, Section 396. With reference to the elements essential to the creation of an easement by implication upon severance of the unity of ownership in land, 17 Am.Jur., Easements, Section 34, contains this language: "Various elements are essential to create an easement by implication upon the severance of the unity of ownership in an estate. They are: (1) A separation of title; (2) necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was *899 meant to be permanent; (3) necessity that the easement be essential to the beneficial enjoyment of the land granted or retained. Another essential is sometimes added to thesenamely that the servitude be continuous, as distinguished from temporary or occasional." In Thompson on Real Property, Permanent Edition, Volume 1, Section 396, the essentials of an easement by implied reservation are stated in these terms: "(1) Unity and subsequent separation of title; (2) obvious benefit to the dominant and burden to the servient tenement existing at the time of the conveyance; (3) use of the premises by the common owner in their altered condition long enough before the conveyance to show that the change was intended to be permanent; and (4) necessity for the easement."
The use of land under an implied easement must be apparent when the severance of ownership occurs and the use is apparent when it may be discovered by reasonable inspection. 28 C.J.S., Easements, § 33. Inasmuch as no person can have an easement on his own property, an easement upon one part for the benefit of another part of the property does not arise until there is a severance of the ownership and such easement as may be created must be determined when the severance occurs. 28 C.J.S., Easements, § 31.
In Miller v. Skaggs, 79 W.Va. 645, 91 S.E. 536, Ann.Cas.1918D, 929, cited and relied upon by the defendants and in which it was held that the plaintiff had an implied easement to use a sewer located beneath the surface of the land of the defendant which was in existence when the severance of ownership of the lands involved occurred, this Court held, in point 1 of the syllabus, that "To raise an implied reservation or grant of an easement the existing servitude must at the time of the deed be apparent, continuous and strictly necessary." In the opinion the Court employed this language, the substance of which is stated in point 2 of the syllabus: "And there is a well recognized rule of the common law, applicable to cases of implied reservations or grants of such easements, namely, that where the owner of two tenements sells one of them, or the owner of one entire estate sells a portion thereof, the purchaser takes the tenement or the portion sold with all the benefits and burdens which appear at the time of the sale to belong to it, as between it and the property which the vendor retains. Lampman v. Milks, 21 N.Y. 505; Seymour v. Lewis, 2 Beas.Ch. 439 [13 N.J.Eq. 439]; Washburn on Easements and Servitude, (4th ed.) 95; Harwood v. Benton, 32 Vt. [724] 733; Goodall v. Godfrey, 53 Vt. 219, 38 Am.Rep. [671] 672." In the opinion this Court expressed the view, as to which there is a conflict of authority, that there is no material distinction between an implied reservation and an implied grant of an easement except that in a grant the terms of the grant are to be construed most strongly against the grantor and in favor of the grantee, and the further view that the necessity for an easement created by an implied reservation or grant is not an absolute necessity but a reasonable necessity as distinguished from mere convenience for its use.
In Bennett v. Booth, 70 W.Va. 264, 73 S.E. 909, 39 L.R.A.,N.S., 618, also cited and relied upon by the defendants and in which this Court recognized an easement by implied reservation where a servitude existed upon the land conveyed for the benefit of the land retained by the grantor at the time of the conveyance, the opinion contains these statements: "When a landowner has created a servitude upon one portion of his land for the benefit of another portion, and conveys the servient part, there is an implied reservation of the easement, if it is essential to the use and enjoyment of the land reserved, and such right passes with the dominant estate, as appurtenant thereto. Nor does the existence of such an easement constitute a breach of the covenant of general warranty, if the easement is so open and apparent that the contracting parties are presumed to have contracted with reference to the condition in which the land then was, and it is not to be supposed that the purchaser agreed to pay any more for the land than he thought it was worth with the burden on it."
*900 In Hoffman v. Shoemaker, 69 W.Va. 233, 71 S.E. 198, 34 L.R.A.,N.S., 632, likewise cited and relied upon by the defendants, and in which this Court recognized an easement by implied reservation over the land of the plaintiff in favor of land owned by the defendant, this Court discussed in detail and reviewed at length the principles which apply to and govern easements created by implication and in the opinion said: "In the textbooks and decided cases, we are told that the easement, to pass to the grantee, or be retained by the grantor, by implication only, must be apparent, continuous and necessary."
If there is a servitude or a burden upon the land of the plaintiff for the benefit of the land of the defendants, as contended by the defendants, and the easement claimed by them was created by an implied reservation in the deed made by Stuart Lakes, Inc., to Doctor Henderson in 1938, the servitude or the burden must have existed at the time of that conveyance, for an easement created by implication must be determined as of that time. When the deed which severed the ownership of the land conveyed to Henderson, and now owned by the plaintiff, from the land in the subdivision owned by the grantor was made, there was no water upon any part of the land which was conveyed to Henderson and no water had come to or had remained upon it prior to that time. A servitude which did not then exist could not be apparent, continuous or necessary within the essential requirements of the previously stated rule which applies to and governs the creation of an easement by implied reservation or grant. No burden or servitude consisting of water permanently impounded upon the land of the plaintiff actually occurred or existed until after the completion by the defendant of the dam to its present height of twenty feet on February 8, 1948, nearly ten years after the land now owned by the plaintiff was conveyed by Stuart Lakes, Inc., to Doctor Henderson.
Even if the parties to the deed from Stuart Lakes, Inc., to Henderson expected or believed, or indeed, knew that when the dam was constructed to the planned height of twenty feet it would cause the land then conveyed to Henderson or a part of it to be permanently inundated by the overflow of water from the lake, the creation of that condition or the existence of that situation was based upon sheer speculation, and depended upon events which if they occurred at all could occur only at some future time. Whether the dam would ever be completed to its planned height or the subdivision developed according to the original plan by Stuart Lakes, Inc., or by any other person, could not then be assured or definitely determined. Indeed, the project as originally planned was never completed by Stuart Lakes, Inc., its former owner, which, because of financial difficulties, in less than five years after it had constructed the dam to its incomplete height of sixteen feet, was compelled to abandon the project in its entirety and completely lost its title to and its control over the subdivision. Without the subsequent activity of the defendant Lake Washington Realty Corporation in its later development of the project, the belief or the expectation of the parties to the deed from Stuart Lakes, Inc., to Doctor Henderson that the tract of 2.9 acres of land would be inundated with water from the lake might never have been realized as, in fact, it was not realized until almost ten years after that deed was made. If an easement by an implied reservation could be created to meet a condition which did not exist when the deed from Stuart Lakes, Inc., to Henderson was made and did not materialize until many years later, or if a right of the grantor to use the land conveyed for a purpose which was then incapable of accomplishment could originate in that manner, an anomaly unknown to the law of easements by implied grant or reservation would occur; and to sanction the claim of the defendants to such an easement would produce that previously unheard of result.
As no servitude or burden to impound water permanently upon the land of the plaintiff or any part of it existed when the land was conveyed by Stuart Lakes, Inc., by the deed to Doctor Henderson in 1938, an easement of that character for the benefit of the land retained by the grantor in the land now owned by the plaintiff was not *901 created by an implied reservation in that deed and no such easement exists in favor of the defendants as its successors in title to the subdivision.
Because the facts in the cases of Miller v. Skaggs, 79 W.Va. 645, 91 S.E. 536, Ann. Cas.1918D, 929; Bennett v. Booth, 70 W.Va. 264, 73 S.E. 909, 39 L.R.A.,N.S., 618, and Hoffman v. Shoemaker, 69 W.Va. 233, 71 S.E. 198, 34 L.R.A.,N.S., 632, in each of which this Court held that an easement by implied reservation existed, are entirely different from the facts in this suit those cases are readily distinguishable from the case at bar. In each of them an apparent, continuous and necessary servitude existed upon the land conveyed by the grantor for the benefit of other land retained by him when the deed was made for the land conveyed to the grantee.
In the Bennett case the plaintiffs sought a mandatory injunction to compel the defendant to remove a mill dam on his own land which caused an overflow of water upon the land of the plaintiffs. Frederick Booth, the former owner of both tracts of land, had erected a grist mill and built a dam on the land. Subsequently he conveyed to his son Jeremiah Booth a part of the land, containing 102 acres, which was later acquired by the plaintiffs and a portion of which was submerged by the mill pond when the suit was instituted. At the time of the conveyance of the land by Frederick Booth to Jeremiah Booth it was burdened by the mill pond impounded by the dam. When the plaintiffs purchased the land which had previously been owned by Jeremiah Booth the dam was out of repair, the mill was not in use and apparently there was no water upon the land. After the plaintiffs acquired the land the dam was repaired and water again overflowed upon the land of the plaintiffs. In the opinion this Court said:
"A mill-dam is essential to a water power grist mill, without it the mill, which is a part of the realty on which it stands, would be useless. Plaintiffs' predecessor in title knew that it backed the water upon his land, it had done so for many years before he bought it, and he is presumed to have taken the land subject to a continuation of that condition. Plaintiffs, his privies in estate, took the land subject to the burden upon it as appurtenant to the other tract of land with the mill on it, and the mill, together with the appurtenant easement, passed to defendant.
"The fact that the mill and dam were in a dilapidated condition at the time plaintiffs purchased, does not the affect the case. Defendant's right was appurtenant to the dominant land and passed with it, it was such a right as could be lost only by adverse possession by the owner of the servient land, for such length of time as would bar an action of ejectment."
The vital difference between the Bennett case and the case at bar is that the servitude involved in that case existed upon the land conveyed for the benefit of the land retained by the grantor when the conveyance was made whereas in this suit the land conveyed to Henderson was, and always had been, entirely free from permanently impounded or standing water when the conveyance was made and was not then subject to any servitude of that nature.
The contention of the defendants that the right of the plaintiff to injunctive relief which she seeks in this suit is barred by laches is devoid of merit. The general rule in equity is that mere lapse of time, unaccompanied by circumstances which create a presumption that the right has been abandoned, does not constitute laches. Cranmer v. McSwords, 24 W.Va. 594; West Virginia Power and Transmission Company v. Voight, 91 W.Va. 581, 114 S.E. 138; Roberts v. Crouse, 89 W.Va. 15, 108 S.E. 421; White v. Bailey, 65 W.Va. 573, 64 S.E. 1019, 23 L.R.A.,N.S., 232; Depue v. Miller, 65 W.Va. 120, 64 S.E. 740, 23 L.R.A.,N.S., 775; Hale v. Hale, 62 W.Va. 609, 59 S.E. 1056, 14 L.R.A.,N.S., 221; Pusey v. Gardner, 21 W.Va. 469. Even long delay does not bar the right of the plaintiff if his intent to abandon it is negatived by his conduct. White v. Bailey, 65 W.Va. 573, 64 S.E. 1019, 23 L.R.A.,N.S., 232; Berry v. Wiedman, 40 W.Va. 36, 20 S.E. 817, 52 Am.St.Rep. 866. "If the right of the plaintiff is clear and not *902 dependent upon oral evidence, and no injury or prejudice to the defendant has resulted from the delay, as by the death of parties, change of conditions, loss of evidence, or the like, the cause of action is not barred by laches, unless the lapse of time and the circumstances are such as to raise a presumption of intent, on the part of the plaintiff, to abandon or relinquish the right." Point 8, syllabus, Depue v. Miller, 65 W.Va. 120, 64 S.E. 740, 23 L.R.A.,N.S., 775. The permanent encroachment of the water from the lake upon the land of the plaintiff did not occur until the completion of the dam to a height of twenty feet on February 8, 1948. Before the dam was so completed, on June 24, 1947, shortly after the first flood, the plaintiff notified the defendant not to construct it to that height and warned the defendant that if it did so water would be impounded upon her land and that the defendant had no right or permission to subject her property "to wash or other damage." Subsequently on March 25, 1949, the plaintiff notified the defendant "to abate impounding of water" on her property caused by the height of the dam and warned the defendant that its failure to do so would render it necessary for her to take proper action to protect her property against the overflow of water from the lake. At the same time she also notified the defendant Forest Lake Club that the height of the dam impounded water on her property and notified it "to abate any invasion of my rights for which you are responsible by reason of any contracts or conveyances". Any sales of lots in the subdivision made by the defendant subsequent to the notice dated June 24, 1947 were concluded after it had been informed that the plaintiff objected to and did not acquiesce in the completion of the dam and that she did not waive or abandon but would assert her right to protect her property against the overflow upon it of water from the lake, and any purchases of lots by the members of the defendant Forest Lake Club after the notice to it from the plaintiff were concluded by them with the knowledge that she had not abandoned but intended to assert her right so to protect her property. Within approximately three months after the notice dated March 25, 1949, the plaintiff brought this suit. In the foregoing circumstances neither of the defendants was prejudiced or adversely affected by any delay of the plaintiff in instituting this suit after the completion of the dam, and the equitable doctrine of laches does not apply to or bar her right to injunctive relief.
The contention of the defendants that the plaintiff is estopped to deny the right of the defendant Lake Washington Realty Corporation to raise the dam and to maintain it at the level of twenty feet is also without merit. The evidence shows that the plaintiff, from the beginning of the new development of the project by the defendant, knew that the defendant intended to complete the dam to an elevation of twenty feet; that if and when it was so completed it would cause water from the lake to inundate her property or a part of it; and that the defendant was engaged in selling, and did sell, many lots in the subdivision to a large number of purchasers upon its representation that the dam would be completed and the lake maintained at an elevation of twenty feet. The evidence also shows that in some instances she assisted her husband, during his employment by the defendant as its agent, in his efforts to sell lots in the subdivision to the extent of showing lots to some purchasers and assisting them to meet with her husband in connection with the purchases made by them; but the evidence further shows that the plaintiff did not at any time act as the agent of the defendant or negotiate or conclude the sale of any certain lot or represent to any purchaser or to the defendant that she would not protect the nearby property owned by her against any overflow of water from the lake that would be caused by the completion of the dam to an elevation of twenty feet.
Though the plaintiff remained silent and did not affirmatively protest at any time against the action of the defendant in selling the lots in the subdivision or against its action in completing the dam until June 24, 1947, when she notified the defendant of her objection to its completion, there was no duty on her part to make such protest. It is clear that any such protest by her would not have deterred or prevented the defendant *903 from its sales of the lots or its completion of the dam for it continued to sell lots upon the representation that the dam would be completed to a height of twenty feet after it received the notice from her in June 1947 before the dam was completed and, notwithstanding the notice, it proceeded to elevate the dam to that height.
It does not appear from the evidence that, whatever may have been the purpose or the motive of the plaintiff in purchasing the tract of 2.9 acres from the widow of Doctor Henderson in March 1946, her silence and her conduct in assisting her husband in connection with the sales of the twenty nine lots made by him as the agent of the defendant misled the defendant in any way or induced it to sell any of the lots or to complete the dam to its full height in the belief that she had waived or would waive any of her rights in her property or that she would not act to protect it fully from any overflow upon it of water from the lake that would result from the elevation of the dam to its height of twenty feet.
The evidence further shows that while the defendant was selling lots in the subdivision and making expenditures in its development, it knew that the plaintiff was the owner of the tract of 2.9 acres and that its construction of the dam to its elevation of twenty feet would cause water from the lake to overflow and remain upon a portion of her property. The defendant also knew that it had no right, without the prior consent of the plaintiff, or unless an implied easement, which it now claims to have, authorized or permitted it so to do, to cause the water from the lake to overflow and remain upon the land of the plaintiff which would result from the completion of the dam.
It is evident that the defendant, with full knowledge of the foregoing facts, relied upon the implied easement which it claims to have to inundate the land of the plaintiff with water from the lake which would result from its construction of the dam to an elevation of twenty feet and, in that belief, it proceeded to construct the dam to that elevation; and that, in so acting, it did not rely upon any conduct of the plaintiff, or her silence until June 1947, as an indication or a representation by her that she would not act to protect her land against the permanent overflow of water upon it caused by its completion of the dam. It can not be said, in view of the unquestioned knowledge of the defendant of the factual conditions at and prior to the time it completed the construction of the dam, that it was misled to its prejudice or was induced to act as it did by the silence or the conduct of the plaintiff.
In the leading case of Norfolk and Western Railway Company v. Perdue, 40 W.Va. 442, 21 S.E. 755, this Court has stated the essential elements of equitable estoppel or, as it is frequently called, estoppel in pais, in these words: "First. There must be conduct, acts, language or silence amounting to a representation of a concealment of material facts. Second. These facts must be known to the party estopped at the time of said conduct, or at least the circumstance must be such that knowledge of them is necessarily imputed to him. Third. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time when such conduct was done, and at the time it was acted upon by him. Fourth. The conduct must be done with the expectation that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. There are several familiar species in which it is simply impossible to ascribe any intention or even expectation to the party estopped that his conduct will be acted upon by the one who afterwards claims the benefit of the estoppel. Fifth. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. Sixth. He must in fact act upon it in such a manner as to change his position for the worse. In other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct, and to assert rights inconsistent with it." See also Spradling *904 v. Spradling, 118 W.Va. 308, 190 S.E. 537; Mason v. Harper's Ferry Bridge Company, 28 W.Va. 639.
The general rule governing the doctrine of equitable estoppel is that in order to constitute equitable estoppel or estoppel in pais there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice. 31 C.J.S., Estoppel, § 67a(1). To raise an equitable estoppel there must be conduct, acts, language or silence amounting to a representation or a concealment of material facts. Norfolk and Western Railway Company v. Perdue, 40 W.Va. 442, 21 S.E. 755; Pocahontas Light and Water Company v. Browning, 53 W.Va. 436, 44 S.E. 267; Cautley v. Morgan, 51 W.Va. 304, 41 S.E. 201; Atkinson v. Plum, 50 W.Va. 104, 40 S.E. 587, 58 L.R.A. 788; Williamson v. Jones, 43 W.Va. 562, 27 S.E. 411, 38 L.R.A. 694, 64 Am.St.Rep. 891; Bettman v. Harness, 42 W.Va. 433, 26 S.E. 271, 36 L.R.A. 566; Bates v. Swiger, 40 W.Va. 420, 21 S.E. 874; Stone v. Tyree, 30 W.Va. 687, 5 S.E. 878; Mason v. Harper's Ferry Bridge Company, 28 W.Va. 639. Mere silence will not raise an estoppel; to be effective it must appear that the person to be estopped has full knowledge of all the facts and of his rights, and intended to mislead or at least was willing that the other party might be misled by his attitude. Campbell v. Lynch, 88 W.Va. 209, 106 S.E. 869.
In Carroll-Cross Coal Company v. Abrams Creek Coal and Coke Company, 83 W.Va. 205, 98 S.E. 148, in which the defense of estoppel interposed by the defendant was rejected, this Court held, in point 6 of the syllabus, that "Knowledge of a trespass or wrong perpetrated by one fully cognizant of the right invaded and silence respecting it after notice do not estop the injured party from asserting his right of action for redress of the injury done." The opinion in that case contains these statements: "* * * mere silence operates as an estoppel only because it is sometimes a form of representation. Williamson v. Jones, 43 W.Va. 562 [27 S.E. 411, 38 L.R.A. 694]; 14 Am. & Eng.Ency.L., 643. * * *, and one claiming a right by estoppel must show that he has been misled by the words, acts or conduct of the other party, while ignorant of his rights. He must be governed by his own knowledge, even though a representation to the contrary may have been made by the other party. In other words, he must have been misled to his injury, and it is impossible that he should have been, when he was fully informed as to the facts." See also Pocahontas Light and Water Company v. Browning, 53 W.Va. 436, 44 S.E. 267; Atkinson v. Plum, 50 W.Va. 104, 40 S.E. 587, 58 L.R.A. 788. "Obviously, one who has full knowledge of the facts cannot rely in good faith upon words or conduct of another which are inconsistent with the truth. Hence, ignorance of the truth as to the matter invoked is, generally speaking, a prerequisite to the right to assert an estopped in pais. * * * Ordinarily, the courts refuse to give effect to an estoppel where the parties were equally well informed as to the essential facts or where the means of knowledge were equally open to them." 19 Am.Jur., Estoppel, Section 86.
In the light of the established facts and circumstances disclosed by the record relating to the knowledge and the conduct of both the plaintiff and the defendant there can be no estoppel in favor of the defendants and against the plaintiff of her right to the relief for which she prays in the bill of complaint.
The equitable doctrine of the balance of conveniences which the defendants contend applies and operates to defeat the claim of the plaintiff to injunctive relief has no application to the facts of this case. As an incident of her ownership of the tract of 2.9 acres of land the plaintiff had the absolute and exclusive right to the full enjoyment of her property and to hold it free from disturbance by any other person *905 regardless of the amount of damage that may have resulted from such disturbance. This right is a natural right which will be regarded and protected as property and as parcel of the land. Roberts v. Martin, 72 W.Va. 92, 77 S.E. 535; Pocahontas Light and Water Company v. Browning, 53 W.Va. 436, 44 S.E. 267. The permanent encroachment of water upon the land of the plaintiff which, it is admitted, was caused by the completion of the dam to its elevation of twenty feet, constituted a violation of a property right of the plaintiff in her land.
In McCausland v. Jarrell, 136 W.Va. 569, 68 S.E.2d 729, a case involving the obstruction and diversion of the natural flow of the water of a stream on the land of the plaintiff caused by the acts of the defendants which permanently impounded water on the land of the plaintiff this Court said: "The obstruction and the improper diversion of the natural flow of the water of the stream on the land of the plaintiff, caused by the acts of the defendants, constituted an infringement of a property right of the plaintiff and, in determining whether injunctive relief against such infringement should be granted, a court of equity should not resort to or apply the doctrine of the balance of equities or conveniences between the parties involved."
The text in 28 Am.Jur., Injunctions, Section 55, contains these pertinent statements: "It has been said that the argument based on the balance of injury to the defendant avails only in a limited class of cases, and that where comparative injury or inconvenience has resulted in the refusal of injunctive relief, it has been where the complainant's injuries were trivial or uncertain or remediable at law. Certainly, the doctrine does not mean that substantial, certain, and irreparable damages to the complaining party, which might be prevented by injunction, are to be left without remedy because of the fact that greater damages would result to the defendant, a wrongdoer, by issuing the injunction. Where the wrong complained of is wilful, wanton, or unprovoked, the injunction should be granted although the loss to the defendant will be greater than the injury to his adversary from its refusal, for no balancing of the inconveniences of private parties will be indulged when the act complained of is tortious in itself as well as in its incidents, and the preservation of a clear right is involved. In such cases, the wrongdoer is not entitled to the benefit of any consideration in a court of equity, nor can it be said that injury would result from the injunction, for no man can complain that he is injured by being prevented from doing, to the hurt of another, that which he has no right to do." See also 43 C.J.S., Injunctions, § 30a.
In County Court of Harrison County v. West Virginia Air Service, Inc., 132 W.Va. 1, 54 S.E.2d 1, in which was involved the right of the plaintiff, as owner of an airport, to enjoin the defendant from repeated trespasses upon its property and in which an injunction was awarded, this Court refused to apply the doctrine of the balance of conveniences between the parties and in the opinion used this language: "But whether on preliminary or final hearing, the doctrine will not be applied where the wrong is wilful, wanton and unprovoked, or where, as here, the acts complained of are tortious and the plaintiff county court is seeking to preserve a clear legal right. American Smelting & Refining Co. v. Godfrey, 8 Cir., 158 F. 225, writ of certiorari denied, 207 U.S. 597, 28 S.Ct. 262, 52 L.Ed. 357; Mobile & Ohio Railroad Co. v. Zimmern, 206 Ala. 37, 89 So. 475, 16 A.L.R. 1352; White v. Harrison, 202 Ala. 623, 81 So. 565. So we are of opinion that the instant case, involving as it does, tortious, continuous acts on the part of the defendant to the irreparable damage of the plaintiff, and in contravention of plaintiff's clear legal right of control of the airport as provided by statute, the doctrine of the balance of conveniences should not be applied."
The defendants complain of the finding of the trial chancellor that the completion of the dam to its height of twenty feet by the defendant Lake Washington Realty Corporation caused or proximately contributed to the temporary and recurrent inundation of the land of the plaintiff when *906 the floods occurred in the area of the subdivision. The evidence bearing upon that question, as previously indicated, is conflicting, and it can not be said that the finding of the trial chancellor is clearly wrong or against the preponderance of the evidence. The rule is firmly established by many decisions of this Court that the finding of fact of the trial chancellor will not be disturbed on appeal unless such finding is clearly wrong or against the preponderance of the evidence. Lantz v. Reed, W.Va., 89 S.E.2d 612; McCausland v. Jarrell, 136 W.Va. 569, 68 S.E.2d 729; Holt Motors v. Casto, 136 W.Va. 284, 67 S.E.2d 432; Adams v. Ferrell, 135 W.Va. 463, 63 S.E. 2d 840; Bennett v. Neff, 130 W.Va. 121, 42 S.E.2d 793; Sutton v. Sutton, 128 W. Va. 290, 36 S.E.2d 608; Taylor v. Taylor, 128 W.Va. 198, 36 S.E.2d 601; Hardin v. Collins, 125 W.Va. 81, 23 S.E.2d 916; Shipper v. Downey, 119 W.Va. 591, 197 S.E. 355; Spradling v. Spradling, 118 W.Va. 308, 190 S.E. 537; Tynes v. Shore, 117 W.Va. 355, 185 S.E. 845; Kincaid v. Evans, 106 W.Va. 605, 146 S.E. 620; Ramsey v. England, 85 W.Va. 101, 101 S.E. 73; Bailey v. Calfee, 49 W.Va. 630, 39 S.E. 642.
The action of the circuit court in denying the motions of the defendants that the plaintiff be awarded damages in lieu of injunctive relief and that the injunction be limited or modified to permit the removal of the water from her land by the construction of dams or dikes or other barriers on their land did not constitute error.
The plaintiff is entitled to injunctive relief to prevent the overflow of water from the lake upon her land and to effectuate the removal of the water impounded upon it as the most effective means of restoring the full enjoyment of her property and of enabling her to hold it free from molestation and disturbance and she should not be compelled to resort to or pursue the inadequate remedy of an award of damages to compensate her for the irreparable injury caused to her land.
The motion of the defendants to limit the scope of the injunction to permit the removal of the water by dams or dikes or other barriers was not based upon any pleading filed by them which sufficiently described the type of such structures or the methods of their construction, or which alleged facts to show that if constructed they would either prevent the future overflow of water upon, or accomplish its removal from, the land of the plaintiff. As the motion was not supported by facts alleged in any pleading it provided no basis for the entry of a valid decree. Moreover, unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse or to modify, continue, or dissolve a temporary or a permanent injunction, whether preventive or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion. 43 C.J.S., Injunctions, § 14; 28 Am.Jur., Injunctions, Section 35; State ex rel. Donley v. Baker, 112 W.Va. 263, 164 S.E. 154; Kessel v. Cohen, 104 W.Va. 296, 140 S.E. 15; County Court of Mercer County v. Princeton Power Company, 113 W.Va. 617, 169 S.E. 450; McEldowney v. Lowther, 49 W.Va. 348, 38 S.E. 644; Robrecht v. Robrecht, 46 W.Va. 738, 34 S.E. 801; Ingles v. Straus, 91 Va. 209, 21 S.E. 490; Jenkins v. Waller, 80 Va. 668. In refusing to limit the scope of the injunction to the extent requested by the defendants the circuit court did not abuse its discretion and its action in overruling the motion will not be disturbed on this appeal.
The final decree of the circuit court is affirmed.
Affirmed.
GIVEN, Judge (dissenting).
Being clearly of the opinion that an implied flowage easement was created in the circumstances of the conveyance of the 2.9 acres from Stuart Lakes, Inc. to Doctor Henderson, later acquired by plaintiff, and that plaintiff, the present owner of the 2.9 *907 acres, is estopped to deny the existence of such an easement, I am forced to this dissent.
Doctor Henderson was one of the promoters and "associates" and was "active in the affiairs of Stuart Lakes, Inc." At the time of the conveyance to Doctor Henderson, in fact long before, he had full knowledge of the proposed plan to raise the level of the lake to twenty feet and that at that level water would flow onto the property conveyed. He presumably knew, as an active "associate", that the only reason the level of the lake had not been raised to that height was because of the requirement of the Public Service Commission relating to the raising of the height of a certain public road before the raising of the level of the lake. He also knew that large sums, many thousands of dollars, had been expended in the construction of the dam and other improvements of the property, all for the purpose of raising the level of the lake to twenty feet; that large numbers of lots had been offered, sold and purchased, upon the representation and belief that the lake would eventually be raised to that level; and that the level of the lake could not be raised to twenty feet without the flowage of water onto a small portion of the 2.9 acre tract of land. He also knew that large losses would result to the company promoting the project and to himself, as well as to purchasers of lots, unless the level of the lake was raised to the twenty foot height. In such circumstances, I cannot conceive of any intention on the part of Doctor Henderson, or the grantor, other than to create such an easement. Can it possibly be believed that the company intended to make it absolutely impossible to complete the raising of the dam, as planned and represented, at a loss of many thousands of dollars to itself and purchasers of lots, by the sale of the 2.9 acre tract at the price of $1,400? Or can it be believed that Doctor Henderson, one of the promoters and "associates", and an owner of other lots in the subdivision which would be adversely affected, had any such intention?
This Court has repeatedly held, as pointed out in the opinion of the Court in the instant case, that an easement may be created by implication. See Miller v. Skaggs, 79 W.Va. 645, 91 S.E. 536, Ann.Cas.1918D, 929; Bennett v. Booth, 70 W.Va. 264, 73 S. E. 909, 39 L.R.A.,N.S., 618; Hoffman v. Shoemaker, 69 W.Va. 233, 71 S.E. 198, 34 L.R.A.,N.S., 632; Nomar v. Ballard, 134 W.Va. 492, 60 S.E.2d 710; Smyth v. Brick Row Realty Co., 97 W.Va. 40, 124 S.E. 499; Boyd v. Woolwine, 40 W.Va. 282, 21 S.E. 1020.
In Miller v. Skaggs, supra, Point 1, Syllabus, the Court held that the requirements for the creation of an easement by implication in this State are that "the existing servitude must at the time of the deed be apparent, continuous and strictly necessary". In Point 4, Syllabus, of the same case, the Court held "strict necessity * * * is not limited to one of absolute necessity, but to reasonable necessity, as distinguished from mere convenience." It is true that some of the text writers and cases from other jurisdictions lay down other and more exacting requirements as to the creation of an easement by implication, but since this Court has passed on the question I deem it unnecessary to point out the differences. The Court, in Miller v. Skaggs, supra, also makes it clear that an easement so created need not have been, previous to its creation, reduced to possession, or actually used, but that the necessity therefor "must at the time of the deed be apparent".
That "reasonable necessity" for the flowage easement contended for in the instant case existed at the time of the delivery of the deed to Doctor Henderson cannot be questioned. The facts relating thereto have already been pointed out. The opinion of the Court does not attempt to show how the level of the lake could be maintained, or how a very great injury to the grantee, the grantor, and purchasers of the lots, could be prevented, without such an easement. It is just as clear that such "reasonable necessity" for the easement was and is "continuous". It appears clear, therefore, to me, that the requirements as to the creation of the flowage easement, as held in Miller v. Skaggs, supra, are present in the instant case.
*908 In Bennett v. Booth, supra, the Court held: "1. If an owner of land erect a mill dam upon it for the purpose of operating a grist mill, and thereafter convey a portion of the land, including a part of the millpond, there is an implied reservation of an easement upon the land granted, as appurtenant to the grist mill." While the opinion of the Court in the instant case attempts to distinguish the controlling facts therein from the controlling facts in the cited case, I can find no material differences. In the instant case, as in the cited case, the titles to the servient and dominant estates were vested in the same owner immediately before the conveyance; the dam was erected by the dominant estate owner in each case; the dam in each case was constructed subsequent to the pertinent conveyance, so that no water was caused to flow upon either of the servient estates until after the creation of the respective easements; and the "reasonable necessity" for the easement in connection with the continuous use and enjoyment of the dominant estate in the instant case is as clearly apparent as it was in the cited case. In view of such facts, which cannot reasonably be disputed, it seems clear that a flowage easement was impliedly created.
The six essential elements constituting an estoppel are set out by this Court in Norfolk and Western Railway Co. v. Perdue, 40 W.Va. 442, 21 S.E. 755, quoted in the opinion of the Court in the instant case. Each of such elements is present in the instant case: (1) There was conduct on the part of plaintiff, as found by the circuit court, which amounted to representation to purchasers of lots, intervening parties in this proceeding, of the fact that the level of the lake would be raised to twenty feet; (2) there cannot be any doubt that plaintiff, the person sought to be estopped, knew that the twenty foot level of the lake would inundate a small portion of the 2.9 acres. A line representing such level had been established, and stakes were set on the 2.9 acre tract indicating such line, all known to plaintiff; (3) the truth as to such facts was unknown to such purchasers at the time of such conduct and representations of plaintiff. Neither the defendant corporation nor the purchasers of land had any knowledge or reason to suspect that plaintiff had any intention of attempting to prevent the raising of the level of the lake to twenty feet, until after the notice served by plaintiff, and after the many and expensive improvements had been made, and lots purchased; (4) the conduct and representations of plaintiff were at a time and for the purpose of inducing purchasers to buy lots; (5) the conduct and representations of plaintiff were relied upon, and in pursuance thereof purchases of lots were made, with the distinct understanding and expectation on the part of the purchasers that the level of the lake would be raised to twenty feet; and (6) the purchasers of lots, in relying upon such conduct and representations of plaintiff, did change their position and were injured thereby.
There is not the least doubt that during the time between the purchase of the 2.9 acres of plaintiff and the time she first gave notice of her intention to contest the right of defendant to so raise the level of the lake to twenty feet, very large sums of money, many times larger than the price of the 2.9 acres paid by plaintiff, were expended on improvements by the defendant corporation, and a very large number of purchasers had expended many, many thousands of dollars in the purchase of lots, believing and relying upon representations to the effect that the level of the lake would be raised to twenty feet. I find nothing in the record to dispute any one of such conclusions. The opinion of the Court does not undertake to point out wherein the facts of the case fall short of any of such conclusions, but seems to rest solely upon the fact that the proof does not show that plaintiff, in such conduct and in the making of such representations, was "the agent of the defendant". But the estoppel contended for is not against the defendant company. It is sought against the plaintiff personally, not as agent of the defendant or of any other purchaser. The conduct and representations of plaintiff, which misled the purchasers *909 of lots to their injury, would not prevent her from being estopped, whether or not such agent.
Prior to the entry of the final decree, a motion was directed to the court to the effect that defendant be permitted to make such fills, dikes or dams on its own property as were necessary to remove any water from the property of plaintiff and to prevent any further flooding thereof, instead of requiring the lowering of the level of the lake. This motion was denied. I am of the view that equity required the granting of the motion. The 2.9 acres were purchased by plaintiff for $1,400. Plaintiff contends that 1,760 square feet of her land has been inundated, while defendant contends that only 345 square feet have been inundated. Thus, according to plaintiff's own testimony, the approximate proportionate value of the land inundated was less than $20. Since the circuit court found and decreed that the lowering of the level of the lake 2.5 feet would prevent water from the lake from flowing on such small parcels of plaintiff's property, it appears certain that defendants could cause any water thereon to be removed, by such methods as proposed, and to thereby prevent further flooding of any land of plaintiff and prevent damages to defendant and the intervening lot owners amounting to many thousands of dollars. Moreover, the evidence clearly shows that the properties fronting on the lake and having easy access thereto are, for that reason, substantially increased in value. Yet this Court tosses the matter aside on the theory that the defendant corporation did not indicate, by pleading or proof, that such methods were available or would accomplish the purposes intended. But I have always understood the law to be that a plaintiff demanding mandatory injunctive relief, especially where to grant the same would do great injury to the defendant, must prove, and prove clearly, the relief to which he is entitled. "Relief by mandatory injunction will be given only where the right of the applicant is clear and the necessity urgent." Point 1, Syllabus, Lamp v. Locke, 89 W.Va. 138, 108 S.E. 889. See Backus v. Abbot, 136 W.Va. 891, 69 S.E.2d 48; Kennedy v. Klammer, 104 W.Va. 198, 139 S.E. 713; Mullens v. Virginian Railway Co., 96 W.Va. 465, 123 S.E. 287; Akers v. Mathieson Alkali Works, 151 Va. 1, 144 S.E. 492. Moreover, in the course of the taking of depositions in this very proceeding, the plaintiff by counsel several times informed the court that she was not seeking a decree requiring "Lake Washington to lower the lake level", in such language as this: "Second, this suit has not been brought for the purpose of requiring Lake Washington to lower the lake level. The purpose of this suit is to require the defendants to remove and abate a nuisance. Whether they do it by lowering the lake level or some other way is their business." Yet in the face of such representations as to the purpose of the suit, as well as the other facts shown, the Court requires the lowering of the level of the lake 2.5 feet, notwithstanding, as the opinion of the Court admits, "It is not disputed that if the present elevation of the dam is lowered as much as 1.9 feet the lots which front on the lake will be rendered practically inaccessible from the lake, the value of all the lots in the subdivision will be greatly and permanently depreciated and impaired * * *".
In view of the facts recited, especially the several statements of counsel of plaintiff, made in the course of the trial, to the effect that the plaintiff did not seek the lowering of the level of the lake, if the decree complained of is equity, it is, to me, equity upside down.
Being of the views indicated, I respectfully dissent. I am authorized to say that LOVINS, Judge, joins in this dissent.